1  Geoffrey M. Davis (SBN 214692)
2  K&L GATES LLP
   10100 Santa Monica Bl., 8th Floor
3  Los Angeles, CA 90067
   Telephone: 310.552.5042
4  Facsimile: 310.552.5001
5  Email: geoffrey.davis@klgates.com

6  Daniel M. Eliades (Admitted *Pro Hac Vice*)
7  K&L GATES LLP
8  One Newark Center, 10th Floor
   Newark, NJ 07102
9  Telephone: 973.848.4018
   Facsimile: 973.848.4001
10 Email: Daniel.Eliades@klgates.com

11

12 *Attorneys for Defendant, Counterclaimant, and
   Third Party Plaintiff, Corcoran Group LLC*

13

14            UNITED STATES DISTRICT COURT

15            CENTRAL DISTRICT OF CALIFORNIA

16

17 ELI Realty Investments, LLC, a Nevada       Case No. 8:22-CV-01195-JWH-ADS
18 limited liability company; Exclusive
   Lifestyles SoCal, LLC, a California limited  **FIRST AMENDED ANSWER,**
19 liability company; Exclusive Lifestyles      **AFFIRMATIVE DEFENSES,**
   San Francisco, Inc., a California            **COUNTERCLAIMS, AND THIRD**
20 corporation; Exclusive Lifestyles Ohio,      **PARTY COMPLAINT OF**
21 LLC, an Ohio limited liability company;      **CORCORAN GROUP LLC**
   and Exclusive Lifestyles Las Vegas, LLC,
22 a Nevada limited liability company,
23
24            Plaintiffs,
25 vs.
26
27 ─────────────────────────────
                                    1

1  Corcoran Group, LLC, a Delaware limited
2  liability company; DOES 1 through 10,

3                              Defendants.

4  Corcoran Group LLC,

5                      Counterclaimant and Third
6                      Party Plaintiff,

7  vs.

8

9  ELI Realty Investments, LLC; Michael
   Mahon Pamela Mahon; MRM
10 Investments, LLC; AIM High Capital
   Partners, LLC; Libertas Funding LLC;
11 Matek LLC; Exclusive Lifestyles SoCal,
12 LLC; Exclusive Lifestyles San Francisco,
   Inc.; Exclusive Lifestyles Ohio, LLC;
13 Exclusive Lifestyles Las Vegas, LLC;
14 Exclusive Lifestyles Tahoe, LLC; and
   DOES 1 - 10,
15

16                      Counterclaim Defendants and
17                      Third Party Defendants.

18

19        Corcoran Group LLC, by way of its First Amended (i) Answer and Affirmative

20 Defenses to the Complaint of ELI Realty Investments, LLC; Exclusive Lifestyles San

21 Francisco, Inc.; Exclusive Lifestyles SoCal, LLC; Exclusive Lifestyles Las Vegas,

22 LLC; Exclusive Lifestyles Ohio, LLC; and (ii) Counterclaims and Third Party

23 Complaint against ELI Realty Investments, LLC; Michael Mahon; Pamela Mahon;

24 MRM Investments LLC; Aim High Capital Partners, LLC; Libertas Funding LLC; Matek

25 LLC; Exclusive Lifestyles SoCal, LLC; Exclusive Lifestyles San Francisco, Inc.;

26

27                                            2

28 **FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD
   PARTY COMPLAINT OF CORCORAN GROUP LLC**
   8:22-CV-01195

Exclusive Lifestyles Ohio, LLC; Exclusive Lifestyles Las Vegas, LLC; Exclusive Lifestyles Tahoe, LLC; and Does 1 through 10, hereby states and alleges:

## ANSWER

### The Parties

1.   Corcoran Group LLC ("Franchisor" or "Corcoran") admits the allegations in paragraph one of the Complaint.

2.   Corcoran admits the allegations in paragraph two of the Complaint.

3.   Corcoran admits the allegations in paragraph three of the Complaint.

4.   Corcoran admits the allegations in paragraph four of the Complaint.

5.   Corcoran admits the allegations in paragraph five of the Complaint.

6.   Corcoran admits the allegations in paragraph six of the Complaint.

7.   Corcoran admits the allegations in paragraph seven of the Complaint.

### Jurisdiction and Venue

8.   Corcoran admits the allegations in paragraph eight of the Complaint.

9.   Corcoran admits the allegations in paragraph nine of the Complaint only to the extent that this Court has personal jurisdiction over Corcoran.  Corcoran denies all remaining allegations in paragraph nine of the Complaint.

10.   Corcoran admits the allegations in paragraph ten of the Complaint only to the extent that Venue is proper in this District.  Corcoran denies all remaining allegations in paragraph nine of the Complaint.

### Corcoran and the Franchise Agreements

11.   Corcoran admits the allegations in paragraph eleven of the Complaint only to the extent that Corcoran was formed on October 1, 2015 and began offering franchises in 2019.  Corcoran denies all remaining allegations in paragraph eleven of the Complaint.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

12.     Corcoran lacks sufficient information and knowledge to form a belief as to the truth of the allegations in the first sentence of paragraph twelve of the Complaint. Corcoran denies the remaining allegations in paragraph twelve of the Complaint.

13.     Corcoran admits the allegations in paragraph thirteen of the Complaint only to the extent that Corcoran provided ELI Realty Investments with a Franchise Disclosure Document.  Corcoran denies all remaining allegations and characterizations, including any characterization of the Franchise Disclosure Document, Policy and Procedures Manuel or Franchise Agreements because the same are written instruments, the terms of which speak for themselves.

14.     Corcoran denies the allegations and characterizations in paragraph 14 of the Complaint, including any characterization of the Franchise Documents because the same are written instruments, the terms of which speak for themselves.

15.     Corcoran denies the allegations and characterizations in paragraph 15 of the Complaint, including any characterization of the Franchise Documents because the same are written instruments, the terms of which speak for themselves.

16.     Corcoran denies the allegations and characterizations in paragraph sixteen of the Complaint, including any characterization of the Franchise Documents because the same are written instruments, the terms of which speak for themselves.

17.     Corcoran denies the allegations and characterizations in paragraph seventeen of the Complaint, including any characterization of the Franchise Documents because the same are written instruments, the terms of which speak for themselves.

18.     Corcoran admits the allegations in paragraph eighteen of the Complaint only to the extent that Corcoran Group and ELI Realty Investments entered a Real Estate Franchise Agreement, the terms of which speaks for itself.  Corcoran lacks

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

sufficient information and knowledge to form a belief as to the truth of the remaining allegations in paragraph eighteen of the Complaint.

19.    Corcoran admits the allegations in paragraph nineteen of the Complaint only to the extent that Corcoran and Exclusive Lifestyles San Francisco Inc. entered a Real Estate Franchise Agreement, the terms of which speaks for itself.  Corcoran lacks sufficient information and knowledge to form a belief as to the truth of the remaining allegations in paragraph nineteen of the Complaint.

20.    Corcoran admits the allegations in paragraph twenty of the Complaint only to the extent that ELI Realty Investments conveyed certain Conversion Promissory Notes to Corcoran. Corcoran denies the remaining allegations and characterizations in paragraph twenty of the Complaint, including any characterization of the Conversion Promissory Notes because the same are written instruments, the terms of which speak for themselves.

21.    Corcoran denies the allegations in paragraph twenty-one of the Complaint, including any characterization of the Conversion Promissory Notes because the same are written instruments, the terms of which speak for themselves.

22.    Corcoran denies the allegation of paragraph twenty-two of the Complaint, including any characterization of the Conversion Promissory Notes because the same are written instruments, the terms of which speak for themselves.

23.    Corcoran admits that it entered into a Franchise Agreement with Exclusive Lifestyles SoCal, LLC that speaks for itself, and denies the remaining allegations of paragraph twenty-three of the Complaint.

24.    Corcoran admits that it entered into a Franchise Agreement with Exclusive Lifestyles Las Vegas, LLC that speaks for itself, and denies the remaining allegations of paragraph twenty-four of the Complaint.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

25.     Corcoran admits that it entered into a Franchise Agreement on or about June 23, 2021, with Exclusive Lifestyles Ohio, LLC that speaks for itself, and denies the remaining allegations of paragraph twenty-five of the Complaint.

26.     Corcoran denies the allegations in paragraph twenty-six of the Complaint, including any characterization of the Franchise Agreements because the same are written instruments, the terms of which speak for themselves.

27.     Corcoran denies the allegations in paragraph twenty-seven of the Complaint.

28.     Corcoran denies the allegations in paragraph twenty-eight of the Complaint.

29.     Corcoran denies the allegations in paragraph twenty-nine of the Complaint.

30.     Corcoran denies the allegations in paragraph thirty of the Complaint.

31.     Corcoran lacks sufficient information and knowledge to form a belief as to the truth of the allegations in paragraph thirty-one of the Complaint concerning Plaintiffs' audit.  Corcoran denies the remaining allegations in paragraph thirty-one of the Complaint, including the allegation that Plaintiffs overpaid $388,153 during 2020.

32.     Corcoran denies the allegations in paragraph thirty-two of the Complaint.

33.     Corcoran admits that it received a letter dated March 17, 2022, that speaks for itself, and denies the remaining allegations of paragraph thirty-three of the Complaint.

34.     Corcoran denies the allegations in paragraph thirty-four of the Complaint.

## **COUNT I**

### **Breach of ELI Realty Investments Contract**

35.     Corcoran repeats and makes a part hereto each and every response contained in the preceding paragraphs of the Answer.

6

36.     Corcoran denies the allegations in paragraph thirty-six of the Complaint.

37.     Corcoran denies the allegations in paragraph thirty-seven of the Complaint.

38.     Corcoran denies the allegations in paragraph thirty-eight of the Complaint.

## COUNT II

### Breach of Exclusive Lifestyles SF Contract

39.     Corcoran repeats and makes a part hereto each and every response contained in the preceding paragraphs of the Answer.

40.     Corcoran denies the allegations in paragraph forty of the Complaint.

41.     Corcoran denies the allegations in paragraph forty-one of the Complaint.

42.     Corcoran denies the allegations in paragraph forty-two of the Complaint.

## COUNT III

### Breach of Exclusive Lifestyles SoCal Contract

43.     Corcoran repeats and makes a part hereto each and every response contained in the preceding paragraphs of the Answer.

44.     Corcoran denies the allegations in paragraph forty-four of the Complaint.

45.     Corcoran denies the allegations in paragraph forty-five of the Complaint.

46.     Corcoran denies the allegations in paragraph forty-six of the Complaint.

## COUNT IV

### Breach of Exclusive Lifestyles LV Contract

47.     Corcoran repeats and makes a part hereto each and every response contained in the preceding paragraphs of the Answer.

48.     Corcoran denies the allegations in paragraph forty-eight of the Complaint.

49.     Corcoran denies the allegations in paragraph forty-nine of the Complaint.

7

50.     Corcoran denies the allegations in paragraph fifty of the Complaint.

## COUNT V

### Breach of Exclusive Lifestyles Ohio Contract

51.     Corcoran repeats and makes a part hereto each and every response contained in the preceding paragraphs of the Answer.

52.     Corcoran denies the allegations in paragraph fifty-two of the Complaint.

53.     Corcoran denies the allegations in paragraph fifty-three of the Complaint.

54.     Corcoran denies the allegations in paragraph fifty-four of the Complaint.

## COUNT VI

### Fraud

55.     Corcoran repeats and makes a part hereto each and every response contained in the preceding paragraphs of the Answer.

56.     Corcoran denies the allegations in paragraph fifty-six of the Complaint.

57.     Corcoran denies the allegations in paragraph fifty-seven of the Complaint, including any characterization of the Conversion Promissory Notes because the same are written instruments, the terms of which speak for themselves.

58.     Corcoran denies the allegations in paragraph fifty-eight of the Complaint, including any characterization of the Conversion Promissory Notes because the same are written instruments, the terms of which speak for themselves.

59.     Corcoran denies the allegations in paragraph fifty-nine of the Complaint.

60.     Corcoran denies the allegations in paragraph sixty of the Complaint.

61.     Corcoran denies the allegations in paragraph sixty-one of the Complaint.

62.     Corcoran denies the allegations in paragraph sixty-two of the Complaint.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

## COUNT VII

## Violation of Cal. Bus. and Prof. Code § 17200

63.     Corcoran repeats and makes a part hereto each and every response contained in the preceding paragraphs of the Answer.

64.     The allegations in paragraph sixty-four state legal conclusions to which no response is required. To the extent a response is required, Corcoran denies any liability for alleged violations of the referenced statute or acts volatile of the referenced statute.

65.     Corcoran denies the allegations in paragraph sixty-five of the Complaint.

66.     Corcoran denies the allegations in paragraph sixty-six of the Complaint.

67.     Corcoran denies the allegations in paragraph sixty-seven of the Complaint.

### JURY DEMAND

68.     Corcoran denies the allegation and jury demand in paragraph sixty-eight of the Complaint. In their Real Estate Franchise Agreements with Corcoran, each of the Plaintiffs specifically waived ". . . the right to a jury trial in any action arising out of or related to this Agreement or any aspect of the relationship between you, us, any guarantor and their respective successors and assigns."

### ANSWER TO PRAYER FOR RELIEF

Corcoran denies that Plaintiffs are entitled to any of the relief requested against Corcoran in the Complaint, or any other relief of any kind. Wherefore, Corcoran prays for judgment as follows: (i) that Plaintiffs take nothing by their Complaint; (ii) that Corcoran be awarded judgment in its favor and against Plaintiffs; (iii) for its costs of suit incurred herein; and (iv) for such other and further relief as this Court may deem

9

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

just and proper, including, but not limited to, attorneys' fees and costs in accordance with applicable law.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a cause of action against Corcoran upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

The Complaint fails to plead claims against Corcoran with sufficient particularity as required by Fed. R. Civ. P. 9(b).

### THIRD AFFIRMATIVE DEFENSE

Plaintiffs' breached the contracts that are the subject of this action and, as such, are not entitled to the damages they seek.

### FOURTH AFFIRMATIVE DEFENSE

If Plaintiffs suffered damages, the same were caused by Plaintiffs' own actions or inactions.

### FIFTH AFFIRMATIVE DEFENSE

Injuries and damages sustained by Plaintiffs, if any, were the result of the acts and/or omissions of third parties other than Corcoran.

### SIXTH AFFIRMATIVE DEFENSE

Injuries and damages sustained by Plaintiffs, if any, were the result of the intentional acts of third parties over which Corcoran has no control.

### SEVENTH AFFIRMATIVE DEFENSE

Injuries and damages sustained by Plaintiffs, if any, were not proximately caused by the conduct of Corcoran.

### EIGHTH AFFIRMATIVE DEFENSE

Corcoran satisfied each and every duty that was owed to Plaintiffs.

## NINTH AFFIRMATIVE DEFENSE

Plaintiffs are barred from seeking equitable relief under the doctrine of unclean hands and other inequitable conduct.

## TENTH AFFIRMATIVE DEFENSE

Although Corcoran disputes that any amounts are due and owing to Plaintiffs, if Plaintiffs establish that amounts are due and owing, Corcoran is entitled to a setoff.

## ELEVENTH SEPARATE DEFENSE

Plaintiffs' claims are barred by the doctrine of avoidable consequences.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrine of laches.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, because of ratification, agreement, acquiescence, or consent to Corcoran's alleged conduct.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred as Plaintiffs have released, settled, entered into an accord and satisfaction or otherwise compromised their claims set forth in the Complaint, and accordingly, said claims are barred by operation of law. Alternatively, Plaintiffs have accepted compensation as partial settlement of those claims for which Corcoran is entitled to a setoff.

## FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred as Plaintiffs have waived, in writing and otherwise, any and all claims sought in this action and are estopped both to assert and to recover upon such claims.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

**SIXTEENTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims are barred as Plaintiffs have acknowledged, ratified, consented to and acquiesced in the alleged acts or omissions, if any, of Corcoran, thus barring Plaintiffs from any relief as prayed for herein.

**SEVENTEENTH AFFIRMATIVE DEFENSE**

Corcoran will rely upon any and all other further defenses which become available or appear during discovery proceedings in this action and hereby specifically reserve the right to amend their answer for the purposes of asserting any such additional affirmative defenses.

## COUNTERCLAIMS AND THIRD PARTY CLAIMS

Corcoran Group LLC, by way of Counterclaims and Third Party Complaint against ELI Realty Investments, LLC; Michael Mahon; Pamela Mahon; MRM Investments LLC; Aim High Capital Partners, LLC; Libertas Funding LLC; Matek LLC; Exclusive Lifestyles SoCal, LLC; Exclusive Lifestyles San Francisco, Inc.; Exclusive Lifestyles Ohio, LLC; Exclusive Lifestyles Las Vegas, LLC; Exclusive Lifestyles Tahoe, LLC; and Does 1 through 10, hereby states and alleges:

## PARTIES, JURISDICTION AND VENUE

1.      Corcoran Group LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at 175 Park Avenue, Madison, New Jersey. Corcoran's sole member is a limited liability company organized under the laws of the State of Delaware with a principal place of business in New Jersey. The membership interests of Corcoran and its members, are set forth in Corcoran's Corporate Disclosure Statement, filed on June 27, 2022 at Docket No. 13.

2.      Counterclaim defendant, ELI Realty Investments, LLC ("ELI Realty") is a limited liability company organized and existing under the laws of the State of Nevada

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

with its principal place of business located at 65 Foothill Road, Suite 2, Reno, Nevada 89511. ELI Realty is a plaintiff in this action. The members of ELI Realty are: (i) MRM Investments LLC, a limited liability company organized and existing under the laws of the State of Nevada, which is owned by Michael Mahon who is a resident of the State of California; (ii) Carbon Brokers LLC, a limited liability company organized and existing under the laws of the State of Kentucky, which is owned by Amon L. Mahon who, upon information and belief, is a resident of the State of Kentucky; (iii) Clermont Capital Consultants, LLC, a limited liability company organized and existing under the laws of the State of Michigan, which is owned by Denise M. Lachman and Larissa Lachman, who, upon information and belief, are residents of the State of Michigan; (iv) Indian Mound Capital Partners, LLC a limited liability company organized and existing under the laws of the State of Michigan, which is owned by Erik. S. Stamell who, upon information and belief, is a resident of the State of Michigan; and (v) MJZ Investments, LLC a limited liability company organized and existing under the laws of the State of Pennsylvania, which is owned by Obie Walli who, upon information and belief, is a resident of the State of Pennsylvania.

3.      Counterclaim defendant, Exclusive Lifestyles SoCal, LLC ("Exclusive SoCal") is a limited liability company organized and existing under the laws of the State of California.  The members of Exclusive SoCal, and their state of residence, are set forth in *Plaintiffs' Notice Re Owners/Members of Limited Liability Company Parties Pursuant to Court Order*, filed on July 15, 2022 at Docket No. 51. Exclusive SoCal is a plaintiff in this action.

4.      Counterclaim defendant, Exclusive Lifestyles San Francisco, Inc. ("Exclusive San Francisco") is a corporation organized and existing under the laws of the State of California.  Exclusive San Francisco is a plaintiff in this action.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

5.      Counterclaim defendant, Exclusive Lifestyles Ohio, LLC ("Exclusive Ohio") is a limited liability company organized and existing under the laws of the State of Ohio. The members of Exclusive Ohio, and their state of residence, are set forth in *Plaintiffs' Notice Re Owners/Members of Limited Liability Company Parties Pursuant to Court Order*, filed on July 15, 2022 at Docket No. 51. Exclusive Ohio is a plaintiff in this action.

6.      Counterclaim defendant, Exclusive Lifestyles Las Vegas, LLC ("Exclusive Las Vegas") is a limited liability company organized and existing under the laws of the State of Nevada.  The members of Exclusive Las Vegas, and their state of residence, are set forth in *Plaintiffs' Notice Re Owners/Members of Limited Liability Company Parties Pursuant to Court Order*, filed on July 15, 2022 at Docket No. 51. Exclusive Las Vegas is a plaintiff in this action.

7.      Third party defendant, Exclusive Lifestyles Tahoe, LLC ("Exclusive Tahoe") was a limited liability company organized and existing under the laws of the State of Nevada with its principal place of business located at 65 Foothill Road, Suite 2, Reno, Nevada 89511. Upon information and belief, Exclusive Las Vegas and Exclusive Tahoe are parties to Articles of Conversion and Articles of Merger (collectively, the "Merger Documents") dated November 1, 2021. Upon information and belief, pursuant to the Merger Documents, Exclusive Las Vegas and Exclusive Tahoe merged and Exclusive Las Vegas became the surviving entity. Exclusive Las Vegas is a plaintiff in this action.

8.      Third party defendant, Michael Mahon is an individual and, upon information and belief, a citizen of the State of California, residing at 26 Panorama, Trabuco, California 92679.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

9.      Third party defendant, Pamela Mahon is an individual and, upon information and belief, a citizen of the State of California, residing at 26 Panorama, Trabuco, California 92679.

10.     Third party defendant, MRM Investments LLC is a limited liability company organized and existing under the laws of the State of Nevada with its principal place of business located at 112 N. Curry Street, Carson City, Nevada 89703. Upon information and belief, Michael Mahon is the sole member of MRM Investments LLC. Michael Mahon is a resident of the State of California.

11.     Third party defendant, Aim High Capital Partners, LLC is a limited liability company organized and existing under the laws of the State of Nevada with its principal place of business located at 701 S. South Carson Street, Suite 200, Carson City, Nevada 89701. The members of Aim High Capital Partners, LLC are (i) MRM Investments, LLC, a limited liability company organized and existing under the laws of the State of Nevada, which is owned by Michael Mahon who is a resident of the State of California; (ii) Carbon Brokers LLC, a limited liability company organized and existing under the laws of the State of Kentucky, which is owned by Amon L. Mahon who is a resident of the State of Kentucky; (iii) Clermont Capital Consultants, LLC, a limited liability company organized and existing under the laws of the State of Michigan, which is owned by Denise M. Lachman and Larissa Lachman, residents of the State of Michigan; (iv) Indian Mound Capital Partners, LLC a limited liability company organized and existing under the laws of the State of Michigan, which is owned by Erik. S. Stamell who is a resident of the State of Michigan; and  (v) MJZ Investments, LLC a limited liability company organized and existing under the laws of the State of Pennsylvania, which is owned by Obie Walli who is a resident of the State of Pennsylvania.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

12.     The members of ELI Realty and Aim High Capital Partners, LLC are identical.

13.     Third party defendant, Libertas Funding LLC is a limited liability company organized and existing under the laws of the State of Connecticut, with its principal place of business located at 411 West Putnam Avenue, Suite 220, Greenwich, Connecticut 06380. Upon information and belief, Gary Katcher, Rick Spear, and Craig Paul are the members of Libertas Funding LLC and, upon information and belief, all are residents of the State of Connecticut.

14.     Third party defendant, Matek LLC is a limited liability company organized and existing under the laws of the State of Pennsylvania with its principal place of business located at 1839 Majestic Dr, Orefield, PA 18069-9115. Upon information and belief, Obie Walli is the sole member of Matek LLC. Upon information and belief, Obie Walli is a resident of the State of Pennsylvania.

15.     Third party defendants, Does 1 through 10 are fictitious entities and/or individuals.  The names and capacities, whether individual, corporate, associate or otherwise of Does 1 through 10, inclusive, are presently unknown to Corcoran and, for that reason, each is sued by such fictitious names.  Corcoran is informed and believes and on that basis alleges that each of the Does 1 through 10 is in some manner responsible for the damages suffered by Corcoran herein. Corcoran will amend this Third Party Complaint when the true names and capacities of the Does are known.

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 inasmuch as Corcoran and all of the counterclaim/third party defendants are citizens of different states, and the amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.  The Court also has subject matter jurisdiction over this action to the extent that certain of Corcoran's claims arise under the Lanham Act, 15 U.S.C. §1114.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD
PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

17.    This Court has personal jurisdiction over Counterclaim Third Party Defendants, Eli Realty, Exclusive SoCal, Exclusive San Francisco, Exclusive Ohio, and Exclusive Las Vegas because they are Plaintiffs in this action.  This Court has personal jurisdiction over Third Party Defendants, Michael Mahon and Pamela Mahon, because, upon information and belief, they are California residents.  This Court has personal jurisdiction over Third Party Defendants,  MRM Investments LLC, Aim High Capital Partners, LLC, Libertas Funding LLC and Matek LLC because, as more fully alleged herein, each of these entities: (i) purposefully availed themselves to the privileges of conducting activities within California by directing their activities there; (ii) the suit arises out of or relates to their contacts with California; and (3) exercising personal jurisdiction in California comports with due process. This Court has personal jurisdiction over Third Party Defendant, Exclusive Tahoe because of its purported merger with Exclusive Las Vegas and because Exclusive Las Vegas is a plaintiff in this action.

## ALLEGATIONS COMMON TO ALL COUNTS

**A.    Overview.**

18.    This controversy has little to do with the allegations contained in the Complaint – which are a smokescreen.

19.    This matter really involves the unlawful (and often clandestine) conduct of ELI Realty and its current management.

20.    Beginning January 2020, Corcoran made loans to ELI Realty that were to be used by ELI Realty to purchase real estate brokerages. ELI Realty and the sellers of those brokerages formed new entities that entered into franchise agreements with Corcoran and thereafter operated approved real estate brokerage offices as franchisees of Corcoran.  ELI Realty maintained a majority interest in each of the newly formed joint ventures.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

21.     ELI Realty holds majority ownership interests in: (i) Exclusive Lifestyles San Francisco, Inc. ("Exclusive San Francisco"); (ii) Exclusive Lifestyles SoCal, LLC ("Exclusive SoCal"); (iii) Exclusive Lifestyles Las Vegas, LLC ("Exclusive Las Vegas"); (iv) Exclusive Tahoe and (v) Exclusive Lifestyles Ohio, LLC ("Exclusive Ohio") - (collectively, the "JV Franchisees"). ELI Realty and each of the JV Franchisees are parties to separate franchise agreements and security agreements with Corcoran.

22.     Unbeknownst to Corcoran, ELI Realty used other proceeds of the Corcoran loans and/or proceeds of Corcoran's collateral to engage in a series of fraudulent conveyances – including payment of lavish distributions or bonuses to insiders, including Michael Mahon, Pamela Mahon, and an entity owned by Obie Walli. Upon information and belief, ELI Realty was aided and abetted in its illicit endeavors by individuals and/or entities (including professionals) who may be identified (and added as parties in this action) as discovery proceeds.

23.     In 2021, ELI Realty attempted to raise $25 million in exchange for senior unsecured notes.  Upon information and belief, this effort was unsuccessful and no funds were raised as a result of the "bond offering" of ELI Realty.

24.     Beginning in December 2021, Michael Mahon entered into unlawful agreements with Libertas Funding LLC, purportedly on behalf of ELI Realty, Exclusive San Francisco, and Exclusive SoCal. Pursuant to the Libertas agreements, ELI Realty, Exclusive San Francisco, and Exclusive SoCal agreed to sell to Libertas the collective sum of $5,864,666.95 of their combined future receipts in exchange for $4,237,144.06 – meaning that these franchisees would realize only 72.25% of every dollar they earned until more than $5.8 million was paid to Libertas. As part of these agreements with Libertas, these franchisees agreed to pay to Libertas over $100,000 each week. Upon information and belief, Mr. Mahon kept the minority shareholders/members of

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

Exclusive San Francisco and Exclusive SoCal in the dark about the Libertas agreements – and did not informed them of their existence.

25.     In or around May 2022, management of ELI Realty advised Corcoran that ELI Realty and the JV Franchisees had a cash flow short fall of millions of dollars. At that time, the outstanding franchise fees due to Corcoran exceeded $1 million. Management of ELI Realty requested that Corcoran make an "emergent" multi-million dollar loan to ELI Realty and the JV Franchisees. Upon information and belief, management of ELI Realty did not inform the minority shareholders/members of the JV Franchisees of the financial condition of the businesses or the request for an "emergent" multi-million dollar loan from Corcoran.

26.     In May 2022, Corcoran noticed ELI Realty and the JV Franchisees (other than Exclusive Tahoe) of various defaults under franchise agreements, notes, and security agreements with Corcoran. Upon information and belief, management of ELI Realty did not inform the minority shareholders/members of the JV Franchisees of any of the default notices.

27.     Corcoran thereafter attempted in good faith to negotiate a forbearance agreement with ELI Realty and the JV Franchisees, but an agreement was not reached. Corcoran believes that a forbearance agreement did not come about because ELI Realty would not consent to discussions between Corcoran and the minority shareholders/members of the JV Franchisees. Upon information and belief, management of ELI Realty did not inform the minority shareholders/members of the JV Franchisees about the forbearance agreement discussions.

28.     Representatives of Corcoran, ELI Realty and the JV Franchisees continued discussions concerning a forbearance agreement throughout the day on June 21, 2022 – with Corcoran waiting to hear back from representatives of ELI Realty and the JV Franchisees. No response came from ELI Realty or the JV Franchisees. Instead, the

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

Complaint in this action was filed on behalf of ELI Realty and the JV Franchisees (other than Exclusive Tahoe) on June 21, 2022.  Upon information and belief, management of ELI Realty did not inform the minority shareholders/members of the JV Franchisees about the filing of the Complaint in this action.

**B.**    **The Corcoran Marks and System.**

29.    Corcoran has the exclusive right to use and sublicense certain trade names, trademarks and service marks that have been registered on the Principal Register of the United States Patent and Trademark Office, with other appropriate state agencies in the United States, and with governmental agencies of foreign countries (which marks, together with certain other trademarks and service marks that are not registered or that are pending registration, are hereinafter collectively referred to as the "Corcoran Marks").

30.    Corcoran has developed a franchise system for the promotion and assistance of independently owned and/or operated real estate brokerage offices, including policies, procedures and techniques designed to enable such offices to compete more effectively in the real estate market (which system is hereinafter referred to as the "Corcoran System").  The Corcoran System includes, but is not limited to, common use and promotion of certain Corcoran Marks, copyrights, trade secrets, centralized advertising programs, recruiting programs, referral programs and sales and management training programs.  Corcoran, from time to time, revises and updates the Corcoran System.

31.    Corcoran or its predecessors have continuously used each of the Corcoran Marks since the date of their registration and those service marks are in full force and effect pursuant to 15 U.S.C. § 1065.  Corcoran has given notice to the public of the registration of the Corcoran Marks as provided in 15 U.S.C. § 1111, and Corcoran uses or has used the Corcoran Marks as abbreviations of its brand name.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

32.     Through its franchise system, Corcoran markets, promotes and provides services to its real estate brokerage franchisees throughout the United States.   To identify the origin of their real estate broker services, Corcoran allows its franchisees to utilize the Corcoran Marks and to otherwise associate their brokerage services with Corcoran.

## C.     The ELI Realty Franchise Agreement.

33.     Corcoran and ELI Realty are parties to that certain Real Estate Franchise Agreement dated January 19, 2020 and certain amendments/addendums thereto[1] (collectively, the "ELI Realty Franchise Agreement").

34.     Pursuant to the ELI Realty Franchise Agreement, ELI Realty obtained the non-exclusive right to utilize the Corcoran System and Corcoran Marks in the operation of approved real estate brokerage offices, defined in the ELI Realty Franchise Agreement, and collectively referred to herein, as the "Offices".

35.     The ELI Realty Franchise Agreement has a term of fifteen (15) years from the "Opening Date".

36.     The ELI Realty Franchise Agreement obligates ELI Realty to pay to Corcoran a "Royalty Fee" and other amounts as and when set forth in Section 7 of the ELI Realty Franchise Agreement.   Nonpayment of the "Royalty Fee" and/or other amounts set forth in Section 7 is an event of default by ELI Realty under the ELI Realty Franchise Agreement.

37.     The ELI Realty Franchise Agreement also requires ELI Realty to report transactions to Corcoran.   Failure by ELI Realty to report transactions as required is an event of default under the ELI Realty Franchise Agreement.

---

[1] The amendments/addendums include the Addendum to Franchise Agreement dated January 17, 2020; the Second Addendum to Franchise Agreement dated September 4, 2020; and the Third Addendum and Ownership Change Addendum dated September 2, 2021.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

38.     In addition to the Royalty Fee, the ELI Realty Franchise Agreement obligates ELI Realty to pay to Corcoran "Brand Marketing Fund" contributions as and when set forth in Section 8 of the ELI Realty Franchise Agreement.  Nonpayment of Brand Marketing Fund contributions is an event of default under the ELI Realty Franchise Agreement.

39.     The ELI Realty Franchise Agreement obligates ELI Realty to pay Corcoran interest and other amounts as and when set forth in Section 11 of the ELI Realty Franchise Agreement.

40.     The ELI Realty Franchise Agreement obligates ELI Realty to pay Corcoran attorneys' fees, costs and other amounts as and when set forth in Section 22.10 of the ELI Realty Franchise Agreement.

41.     The ELI Realty Franchise Agreement obligates ELI Realty to pay Corcoran certain liquidated damages in the event of that the ELI Realty Franchise Agreement is terminated before the "Expiration Date" (as defined in the ELI Realty Franchise Agreement), other than by mutual consent.

42.     The ELI Realty Franchise Agreement is governed by the laws of the State of New Jersey as set forth in Section 22.5 of the ELI Realty Franchise Agreement.

43.     In Section 22.8 of the ELI Realty Franchise Agreement, ELI Realty waived ". . . the right to a jury trial in any action arising out of or related to this Agreement or any aspect of the relationship between you, us, any guarantor and their respective successors and assigns."

**D.     The ELI Realty Guaranty.**

44.     Michael Mahon, Pamela Mahon, and MRM Investments LLC are collectively referred to as the "Guarantors".

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

45.     On or around January 17, 2020, Guarantors executed and conveyed to Corcoran a Guaranty of Payment and Performance (collectively the "ELI Realty Guaranty").

46.     Pursuant to the ELI Realty Guaranty, Guarantors guaranteed prompt payment and performance of all of the obligations of ELI Realty to Corcoran under the ELI Realty Franchise Agreement as well as all other agreements or instruments between ELI Realty and Corcoran, including the Notes (defined below) and ELI Realty Security Agreement (defined below).

47.     The ELI Realty Guaranty was conveyed to Corcoran to, among other things, induce Corcoran to accept ELI Realty as a franchisee and to convey certain loans to ELI Realty that are evidenced by the Notes (defined below).

48.     The ELI Realty Guaranty is governed by the laws of the State of New Jersey in all respects.

49.     In the ELI Realty Guaranty, each of the Guarantors waived the right to a jury trial in any action arising out of or related to this ELI Realty Franchise Agreement or any aspect of the relationship between Corcoran, ELI Realty, or any of the Guarantors.

**E.     The Corcoran Loans and the ELI Realty Notes.**

50.     From January 2020 through February 2022, Corcoran advanced various loans to ELI Realty (the "Corcoran Loans").

51.     The proceeds of the Corcoran Loans were to be used by ELI Realty to purchase ownership interests in brokerages, then form entities that would enter into separate Real Estate Franchise Agreements with Corcoran, and thereafter operate approved real estate brokerage offices as franchisees of Corcoran.

52.     In connection with the Corcoran Loans, ELI Realty executed and conveyed to Corcoran the following Conversion Promissory Notes (collectively, the "Notes"): (i)

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

Conversion Promissory Note dated January 23, 2020; (ii) Conversion Promissory Note dated January 28, 2020; (iii) Conversion Promissory Note dated June 30, 2020; (iv) Conversion Promissory Note dated July 27, 2020; (v) Conversion Promissory Note dated September 8, 2020; (vi) Conversion Promissory Note dated September 9, 2020; (vii) Conversion Promissory Note dated September 29, 2020; (viii) Conversion Promissory Note dated November 13, 2020; (ix) Conversion Promissory Note dated November 30, 2020; (x) Conversion Promissory Note dated December 9, 2020; (xi) Conversion Promissory Note dated December 10, 2020; (xii) Conversion Promissory Note dated March 11, 2021; (xiii) Conversion Promissory Note dated March 11, 2021; (xiv) Conversion Promissory Note dated March 15, 2021; (xv) Conversion Promissory Note dated June 2, 2021; (xvi) Conversion Promissory Note dated July 8, 2021; (xvii) Conversion Promissory Note dated August 12, 2021; (xviii) Conversion Promissory Note dated August 18, 2021; (xix) Conversion Promissory Note dated September 1, 2021; (xx) Conversion Promissory Note dated September 1, 2021; (xxi) Conversion Promissory Note dated October 20, 2021; (xxii) Conversion Promissory Note dated November 3, 2021; (xxiii) Conversion Promissory Note dated December 2, 2021; (xxiv) Conversion Promissory Note dated January 10, 2022; (xxv) Conversion Promissory Note dated January 12, 2022; (xxvi) Conversion Promissory Note dated January 27, 2022; and (xxviii) Conversion Promissory Note dated February 28, 2022.

53.    Michael Mahon executed each of the Notes on behalf of ELI Realty.

54.    A default by ELI Realty of any agreement between Corcoran and ELI Realty, including the ELI Realty Franchise Agreement and the ELI Realty Security Agreement (defined below), is an event of default under each of the Notes.

55.    Termination or expiration of the ELI Realty Franchise Agreement is also an event of default under each of the Notes.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

56.     Upon an event of default under the Notes, which has not been cured within the applicable time period, if any, Corcoran is entitled to accelerate the unpaid principal of the Notes and all accrued interest, and the same shall become immediately due and payable by ELI Realty, and is not subject to any rights of offset or recoupment.

57.     In the Notes, ELI Realty agreed to pay all expenditures made by Corcoran in any attempt to collect amounts due under the Notes, including reasonable attorneys' fees and costs.

58.     The Notes are governed by the laws of the State of New Jersey.

**F.**     **The ELI Realty Security Agreement.**

59.     To secure payment and performance of ELI Realty under the ELI Realty Franchise Agreement, Notes, and all other agreements of ELI Realty to Corcoran, ELI Realty granted security interests to Corcoran in certain property pursuant to that certain Security Agreement dated January 17, 2020 (the "ELI Realty Security Agreement").

60.     Pursuant to the Security Agreement, ELI Realty granted Corcoran a security interest in the following property then owned or thereafter acquired by ELI Realty (the "Corcoran-ELI Realty Collateral"):

*For good and valuable consideration, the receipt and sufficiency of which are acknowledged, Debtor grants to Secured Party a security interest in all accounts receivable and payment intangibles; cash proceeds; contract rights; leases; furniture; furnishings; equipment; fixtures; inventory; commissions; real estate listings, listing agreements and related rights which are located at, utilized by or related to the real estate brokerage business conducted by Debtor and including the proceeds therefrom and any and all amendments or replacements thereto and any rebate/award program (or similar incentive programs) to which Debtor and/or any Co-Debtors may be entitled pursuant to any franchise agreement entered into with Secured Party, together with all such rights and property hereafter acquired by Debtor and Co- Debtors; and all general intangibles (collectively, the "Collateral") as well as all parts, replacements, substitutions, profits, products and cash and non-cash proceeds of the foregoing Collateral (including insurance and condemnation proceeds payable by reason of condemnation of or loss or damage thereto). [Add following only for Security*

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

*Agreements filed in New Jersey - The Collateral described herein falls within the scope of the Uniform Commercial Code enacted in New Jersey, including N.J.S.A. 12A:9-102 and N.J.S.A. 12A:9-109.] The foregoing Collateral is granted to Secured Party as security for (i) the prompt payment of any promissory notes executed by Debtor in favor of Secured Party, and any renewals, compromises, extensions, modifications, accelerations or other changes in the time for performance or other terms (the "Notes"), and (ii) performance under any franchise agreements between Debtor and Secured Party, as the same may be amended (the "Franchise Agreements"), and (iii) all other agreements between Debtor and Secured Party.*

61.    The security interests granted per the ELI Realty Security Agreement were perfected by the filing of a UCC-1 Financing Statement with the Secretary of State of the State of Nevada on January 31, 2020 under number 2020069173-2.

62.    At Section 1 of the ELI Realty Security Agreement, ELI Realty[2] agreed as follows:

(a)    *Debtor will properly maintain and care for the Collateral and will not remove the Collateral from the Offices (as defined in the Franchise Agreements);*

(b)    *Debtor will notify Secured Party in writing prior to any change in Debtor's place of business;*

(c)    *Debtor has not executed and will not execute as Debtor any security agreement or financing statement covering any of the Collateral except with Secured Party, nor will Debtor pledge or encumber the Collateral, or allow any lien to be placed against the Collateral, whether voluntary or involuntary;*

(d)    *Debtor represents and warrants to Secured Party that the Collateral shall not become collateral for any other obligations previously incurred, nor collateral under any other security agreement(s) previously executed by Debtor; and*

---

[2] ELI Realty is the Debtor under the ELI Realty Security Agreement.

26

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

*(e)     Debtor will not sell, contract for sale or otherwise dispose of any of the Collateral except in the ordinary course of business.*

63.     ELI Realty's breach of any term, provision, warranty or representation in the ELI Realty Security Agreement, the ELI Realty Franchise Agreement, or any other agreement between the parties is an "Event of Default" of the ELI Realty Security Agreement.

64.     Upon an Event of Default of the ELI Realty Security Agreement, among other things, Corcoran may (i) declare all obligations secured by the ELI Realty Security Agreement immediately due and payable, and (ii) require ELI Realty to assemble the Corcoran-ELI Realty Collateral and make it available to Corcoran.

65.     The ELI Realty Security Agreement is governed by the laws of the State of New Jersey.

**G.     The ELI Realty JV Equity Interests.**

66.     ELI Realty directly or indirectly owns, beneficially and of record, the majority of the issued and outstanding shares of capital stock or membership interests in the following entities: (i) Exclusive Lifestyles San Francisco, Inc.; (ii) Exclusive Lifestyles SoCal, LLC; (iii) Exclusive Lifestyles Las Vegas, LLC[3]; (iv) Exclusive Lifestyles Tahoe, LLC; and (v) Exclusive Lifestyles Ohio, LLC.   The foregoing ownership interests of ELI Realty are collectively referred to as the "ELI Realty JV Equity Interests".

67.     The JV Franchisees are each parties to separate Real Estate Franchise Agreements and Security Agreements with Corcoran.

---

[3] Exclusive Lifestyles Reno, LLC ("Exclusive Reno") owns 62.99% of the membership interests in Exclusive Las Vegas.  Exclusive Reno is wholly owned by ELI Realty.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

**H.      The Exclusive San Francisco – Corcoran Agreements.**

68.      ELI Realty owns, beneficially and of record, the majority of the issued and outstanding shares of capital stock of Exclusive San Francisco.

69.      ELI Realty acquired all of its equity interests in Exclusive San Francisco with proceeds of certain of the Corcoran Loans that are evidenced by certain of the Notes.

70.      Corcoran and Exclusive San Francisco are parties to that certain Real Estate Franchise Agreement dated January 30, 2020 and certain amendments/addendums thereto[4] (collectively, the "San Francisco Franchise Agreement").

71.      Guarantors executed and conveyed to Corcoran a Guaranty of Payment and Performance (collectively the "San Francisco Guaranty"), guaranteeing payment and performance of all of the obligations of Exclusive San Francisco to Corcoran under the San Francisco Franchise Agreement as well as all other agreements or instruments between Exclusive San Francisco and Corcoran. The San Francisco Guaranty was conveyed to Corcoran to, among other things, induce Corcoran to accept Exclusive San Francisco as a franchisee.

72.      To secure payment and performance of Exclusive San Francisco under the San Francisco Franchise Agreement and all other agreements of Exclusive San Francisco to Corcoran, Exclusive San Francisco granted security interests to Corcoran in certain property pursuant to that certain Security Agreement dated January 23, 2020 (the "Exclusive San Francisco Security Agreement"). The security interests granted per the Exclusive San Francisco Security Agreement were perfected by the filing of a UCC-

---

[4] The amendments/addendums include the Addendum to Franchise Agreement effective January 30, 2020 and the Location Addendum and Seventh Addendum to Franchise Agreement effective September 9, 2021.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

1 Financing Statement with the Secretary of State of the State of California on December 10, 2020 under number U200035937533.

## I. The Exclusive SoCal – Corcoran Agreements.

73.    ELI Realty owns, beneficially and of record, the majority of the issued and outstanding membership interests in Exclusive SoCal.

74.    ELI Realty acquired all of its equity interests in Exclusive SoCal with the proceeds of certain of the Corcoran Loans that are evidenced by certain of the Notes.

75.    Corcoran and Exclusive SoCal are parties to that certain Real Estate Franchise Agreement dated September 11, 2020 and certain amendments/addendums thereto[5] (collectively, the "SoCal Franchise Agreement").

76.    On or around September 10, 2020, Guarantors executed and conveyed to Corcoran a Guaranty of Payment and Performance (collectively the "SoCal Guaranty"), guaranteeing payment and performance of all of the obligations of Exclusive SoCal to Corcoran under the SoCal Franchise Agreement as well as all other agreements or instruments between Exclusive SoCal and Corcoran. The SoCal Guaranty was conveyed to Corcoran to, among other things, induce Corcoran to accept Exclusive SoCal as a franchisee.

77.    To secure payment and performance of Exclusive SoCal under the SoCal Franchise Agreement and all other agreements of Exclusive SoCal to Corcoran, Exclusive SoCal granted security interests to Corcoran in certain property pursuant to that certain Security Agreement dated September 9, 2020 (the "Exclusive SoCal Security Agreement"). The security interests granted per the Exclusive SoCal Security Agreement were perfected by the filing of a UCC-1 Financing Statement with the

---

[5] The amendments/addendums include the Addendum to Franchise Agreement effective September 11, 2020, the Location Addendum and Second Addendum to Franchise Agreement effective November 11, 2020, and the Location Addendum and Sixth Addendum to Franchise Agreement effective March 11, 2021.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

Secretary of State of the State of California on September 14, 2020 under number U200019083025.

**J.      The Exclusive Las Vegas – Corcoran Agreements.**

78.      ELI Realty indirectly owns the majority of the issued and outstanding membership interests in Exclusive Las Vegas.

79.      Specifically, Exclusive Reno owns 62.99% of the membership interests in Exclusive Las Vegas. Exclusive Reno is wholly owned by ELI Realty.

80.      Exclusive Reno acquired all of its equity interests in Exclusive Las Vegas with proceeds of certain of the Corcoran Loans that are evidenced by certain of the Notes.

81.      Corcoran and Exclusive Las Vegas are parties to that certain Real Estate Franchise Agreement dated June 23, 2021 and certain amendments/addendums thereto[6] (collectively, the "Las Vegas Franchise Agreement").

82.      On or around June 23, 2021, Guarantors executed and conveyed to Corcoran a Guaranty of Payment and Performance (collectively the "Las Vegas Guaranty"), guaranteeing payment and performance of all of the obligations of Exclusive Las Vegas to Corcoran under the Las Vegas Franchise Agreement as well as all other agreements or instruments between Exclusive Las Vegas and Corcoran. The Las Vegas Guaranty was conveyed to Corcoran to, among other things, induce Corcoran to accept Exclusive Las Vegas as a franchisee.

83.      To secure payment and performance of Exclusive Las Vegas under the Las Vegas Franchise Agreement and all other agreements of Exclusive Las Vegas to Corcoran, Exclusive Las Vegas granted security interests to Corcoran in certain

---

[6] The amendments/addendums include the Addendum to Franchise Agreement effective June 23, 2021, the Location Addendum and Second Addendum to Franchise Agreement effective September 3, 2021, the Location Addendum and Third Addendum to Franchise Agreement effective September 28, 2021, and the Location Addendum and Fourth Addendum to Franchise Agreement effective November 3, 2021.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD
PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

property pursuant to that certain Security Agreement dated May 10, 2021 (the "Exclusive Las Vegas Security Agreement"). The security interests granted per the Exclusive Las Vegas Security Agreement were perfected by the filing of a UCC-1 Financing Statement with the Secretary of State of the State of Nevada on September 13, 2021 under number 2021196331-5.

**K.    The Exclusive Tahoe – Corcoran Agreements.**

84.    ELI Realty owns, beneficially and of record, the majority of the issued and outstanding membership interests in Exclusive Tahoe.

85.    ELI Realty acquired all of its equity interests in Exclusive Tahoe with the proceeds of certain of the Corcoran Loans that are evidenced by certain of the Notes.

86.    Corcoran and Exclusive Tahoe are parties to that certain Real Estate Franchise Agreement dated September 29, 2020 and any written amendments/addendums thereto (collectively, the "Tahoe Franchise Agreement").

87.    Guarantors executed and conveyed to Corcoran a Guaranty of Payment and Performance (the "Tahoe Guaranty"), guaranteeing payment and performance of all of the obligations of Exclusive Tahoe to Corcoran under the Tahoe Franchise Agreement as well as all other agreements or instruments between Exclusive Tahoe and Corcoran. The Tahoe Guaranty was conveyed to Corcoran to, among other things, induce Corcoran to accept Exclusive Tahoe as a franchisee.

88.    To secure payment and performance of Exclusive Tahoe under the Tahoe Franchise Agreement and all other agreements of Exclusive Tahoe to Corcoran, Exclusive Tahoe granted security interests to Corcoran in certain property pursuant to that certain Security Agreement dated September 29, 2020 (the "Exclusive Tahoe Security Agreement"). The security interests granted per the Exclusive Tahoe Security Agreement were perfected by the filing of a UCC-1 Financing Statement with the

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

Secretary of State of the State of Nevada on September 29, 2020 under number 2020132169-7.

89.   Upon information and belief, Exclusive Las Vegas and Exclusive Tahoe are parties to Articles of Conversion and Articles of Merger dated November 1, 2021. Upon information and belief, pursuant to the Merger Documents, Exclusive Las Vegas and Exclusive Tahoe merged and Exclusive Las Vegas became the surviving entity.

90.   Exclusive Las Vegas and Exclusive Tahoe did not advise Corcoran of the merger prior to November 1, 2021.

91.   As a result of the merger, Exclusive Tahoe defaulted under the Tahoe Franchise Agreement on account of the Transfer of the Franchisee (as defined in the Tahoe Franchise Agreement) without notice to or approval of Corcoran.

**L.    The Exclusive Ohio – Corcoran Agreements.**

92.   ELI Realty owns, beneficially and of record, the majority of the issued and outstanding membership interests in Exclusive Ohio.

93.   ELI Realty acquired all of its equity interests in Exclusive Ohio with proceeds of certain of the Corcoran Loans that are evidenced by certain of the Notes.

94.   Corcoran and Exclusive Ohio are parties to that certain Real Estate Franchise Agreement dated October 22, 2021 and certain amendments/addendums thereto[7] (collectively, the "Ohio Franchise Agreement").

95.   On or around October 20, 2021, Guarantors executed and conveyed to Corcoran a Guaranty of Payment and Performance (collectively the "Ohio Guaranty"), guaranteeing payment and performance of all of the obligations of Exclusive Ohio to Corcoran under the Ohio Franchise Agreement as well as all other agreements or instruments between Exclusive Ohio and Corcoran. The Ohio Guaranty was conveyed

---

[7] The amendments/addendums include the Addendum to Franchise Agreement effective October 20, 2021.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

to Corcoran to, among other things, induce Corcoran to accept Exclusive Ohio as a franchisee.

96.     To secure payment and performance of Exclusive Ohio under the Ohio Franchise Agreement and all other agreements of Exclusive Ohio to Corcoran, Exclusive Ohio granted security interests to Corcoran in certain property pursuant to that certain Security Agreement dated August 3, 2021 (the "<u>Exclusive Ohio Security Agreement</u>"). The security interests granted per the Exclusive Ohio Security Agreement were perfected by the filing of a UCC-1 Financing Statement with the Secretary of State of the State of Ohio on May 23, 2022 under number OH00263498464.

**M.     <u>ELI Realty Franchise Agreement and Note Defaults – Monetary</u>.**

97.     ELI Realty is in default of its monetary obligations to Corcoran under the ELI Realty Franchise Agreement for failing to pay amounts to Corcoran as and when due under the ELI Realty Franchise Agreement.

98.     As of May 18, 2022, the sum of <u>at least</u> $440,570.75 (the "<u>ELI Realty Arrears</u>") was outstanding and past due by ELI Realty to Corcoran under the ELI Realty Franchise Agreement. The ELI Realty Arrears exclude any amounts due for unreported transactions, attorney's fees and costs, or obligations under the ELI Realty Franchise Agreement which may accrue after May 18, 2022.

99.     ELI Realty is separately in default under the Notes due to, among other things, its foregoing default under the ELI Realty Franchise Agreement.

100.   By letter dated May 22, 2022, Corcoran noticed ELI Realty and Guarantors of defaults under the ELI Realty Franchise Agreement and Notes and demanded that ELI Realty pay the ELI Realty Arrears on or before June 21, 2022.

101.   ELI Realty failed to pay any of the ELI Realty Arrears on or before June 21, 2022.

102.   Because ELI Realty has continued to fail to pay amounts to Corcoran as and when due under the ELI Realty Franchise Agreement, the outstanding amount past due by ELI Realty to Corcoran is greater than the amount of the ELI Realty Arrears.

**N.    Security Agreement and Note Defaults – Sale of Corcoran Collateral to Libertas.**

103.   ELI Realty is in incurable default of the ELI Realty Security Agreement and the Notes on account of its sale of Corcoran-ELI Realty Collateral to Libertas Funding LLC ("Libertas").

104.   Exclusive San Francisco and Exclusive SoCal are likewise in incurable default of the respective Exclusive San Francisco Security Agreement and Exclusive SoCal Security Agreement on account of their sale of Corcoran collateral to Libertas.

105.   Pursuant to the (i) Agreement of Sale of Future Receipts dated December 8, 2021; (ii) Agreement of Sale of Future Receipts dated February 18, 2022; and (iii) Agreement of Sale of Future Receipts dated April 13, 2022 (collectively, the "Libertas Agreements"), ELI Realty, Exclusive San Francisco, and Exclusive SoCal agreed to sell specified amounts of their "Future Receipts" (as defined in the Libertas Agreements) to Libertas in exchange for deeply discounted advance payments.

106.   In the Agreement of Sale of Future Receipts dated December 8, 2021, ELI Realty, Exclusive San Francisco, and Exclusive SoCal agreed to sell Libertas $2,660,000 of their Future Receipts in exchange for $1,980,000.

107.   The Agreement of Sale of Future Receipts dated December 8, 2021, requires ELI Realty, Exclusive San Francisco, and Exclusive SoCal to deliver to Libertas approximately $63,333.35 of their Future Receipts each week until the entire "Completion Amount" (as defined in the Libertas Agreements) is paid to Libertas.

108.   In the Agreement of Sale of Future Receipts dated February 18, 2022, ELI Realty, Exclusive San Francisco, and Exclusive SoCal agreed to sell to Libertas $1,995,000 of their Future Receipts in exchange for $1,485,000.

109.   The Agreement of Sale of Future Receipts dated February 18, 2022, requires ELI Realty, Exclusive San Francisco, and Exclusive SoCal to deliver to Libertas approximately $47,500 of their Future Receipts each week until the entire Completion Amount is paid to Libertas.

110.   In the Agreement of Sale of Future Receipts dated April 13, 2022, ELI Realty, Exclusive San Francisco, and Exclusive SoCal agreed to sell Libertas $2,793,000 of their Future Receipts in exchange for (i) $1,306,855.94 to be paid to Libertas "and/or Other Funders" and (ii) $772,144.06 to ELI Realty, Exclusive San Francisco, and/or Exclusive SoCal.

111.   The Agreement of Sale of Future Receipts dated April 13, 2022, requires ELI Realty, Exclusive San Francisco, and Exclusive SoCal to deliver to Libertas approximately $66,500 of their Future Receipts each week until the entire Completion Amount is paid to Libertas.

112.   Pursuant to the Libertas Agreements, ELI Realty, Exclusive San Francisco, and Exclusive SoCal agreed to sell to Libertas the combined total of $5,864,666.95 of their combined Future Receipts in exchange for $4,237,144.06.

113.   Michael Mahon is the guarantor of the obligations of ELI Realty, Exclusive San Francisco, and Exclusive SoCal under the Libertas Agreements.

114.   Michael Mahon executed the Libertas Agreements individually and on behalf of ELI Realty, Exclusive San Francisco, Exclusive SoCal, and other entities.

115.   In executing the Libertas Agreements, Michael Mahon falsely represented that entering into and performing under the Libertas Agreements would not result in

35

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

breach or violation of, or default under, any agreement or instrument by which ELI Realty, Exclusive San Francisco, or Exclusive SoCal were bound.

116.   The Libertas Agreements each state that the transactions amount to a sale of the Future Receipts to Libertas and are not loans from Libertas.  In fact, the Libertas Agreements state: *"Merchant and Guarantor expressly agree not to take the position that this transaction is a loan, and they expressly waive any and all claims and defenses based on that position in any action or proceeding arising out of this Agreement, including without limitation claims or defenses of usury."*

117.   The Future Receipts sold to Libertas by ELI Realty, Exclusive San Francisco, and Exclusive SoCal constitute collateral of Corcoran under the ELI Realty Security Agreement, Exclusive San Francisco Security Agreement and/or Exclusive SoCal Security Agreement.

118.   The sale of Future Receipts to Libertas by ELI Realty, Exclusive San Francisco, and Exclusive SoCal was not in the ordinary course of business of ELI Realty, Exclusive San Francisco, or Exclusive SoCal.

119.   Each sale of Future Receipts to Libertas by ELI Realty, Exclusive San Francisco, and Exclusive SoCal constitutes an incurable event of default under the ELI Realty Security Agreement, Exclusive San Francisco Security Agreement and/or Exclusive SoCal Security Agreement.

120.   By letter dated May 26, 2022, Corcoran noticed ELI Realty and Guarantors of defaults under the terms of the ELI Realty Security Agreement and the Notes as a result of the sale of Corcoran-ELI Realty Collateral to Libertas pursuant to the Libertas Agreements.

121.   In its letter of May 26, 2022, Corcoran also accelerated the unpaid principal and all interest accrued under each of the Notes and demanded immediate payment thereof.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD
PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

122.   In its letter of May 26, 2022, Corcoran advised ELI Realty and Guarantors of outstanding principal amounts due under the Notes and Corcoran demanded immediate payment thereof.

123.   Neither ELI Realty nor the Guarantors have responded to the notice of default contained in Corcoran's letter of May 26, 2022.

124.   ELI Realty and Guarantors have failed to pay Corcoran any of the amounts demanded in the letter of May 26, 2022.

125.   By letter dated May 31, 2022, Corcoran noticed Exclusive San Francisco and Guarantors of defaults under the terms of the Exclusive San Francisco Security Agreement and San Francisco Franchise Agreement as a result of the sale of collateral of Corcoran to Libertas pursuant to the Libertas Agreements.  Neither Exclusive San Francisco nor the Guarantors have responded to the notice of default contained in Corcoran's letter of May 31, 2022.

126.   By letter dated May 31, 2022, Corcoran noticed Exclusive SoCal and Guarantors of defaults under the terms of the Exclusive SoCal Security Agreement and SoCal Franchise Agreement as a result of the sale of collateral of Corcoran to Libertas pursuant to the Libertas Agreements.  Neither Exclusive SoCal nor the Guarantors have responded to the notice of default contained in Corcoran's letter of May 31, 2022.

**O.**   **Franchise Agreement Defaults by JV Franchisees.**

127.   With the possible exception of Exclusive Tahoe, by May of 2022, the JV Franchisees were  each in default of their obligations to Corcoran for failing to pay amounts to Corcoran as and when due under the JV Franchise Agreements.[8]

---

[8] Collectively, the "JV Franchise Agreements" are the San Francisco Franchise Agreement, SoCal Franchise Agreement, Las Vegas Franchise Agreement, Tahoe Franchise Agreement, and Ohio Franchise Agreement.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

128.   Exclusive San Francisco is in default of its monetary obligations to Corcoran under the San Francisco Franchise Agreement for failing to pay amounts to Corcoran as and when due under the San Francisco Franchise Agreement. As of May 18, 2022, the sum of at least $429,719.55 (the "San Francisco Arrears") was outstanding and past due by Exclusive San Francisco to Corcoran under the San Francisco Franchise Agreement. The San Francisco Arrears exclude any amounts due for unreported transactions, attorney's fees and costs, or obligations under the San Francisco Franchise Agreement which may accrue after May 18, 2022. By letter dated May 22, 2022, Corcoran noticed Exclusive San Francisco and Guarantors of the defaults under the San Francisco Franchise Agreement.  Despite its receipt of valid and effective notice, Exclusive San Francisco has failed to cure the noticed defaults.

129.   Exclusive SoCal is in default of its monetary obligations to Corcoran under the SoCal Franchise Agreement for failing to pay amounts to Corcoran as and when due under the SoCal Franchise Agreement. As of May 18, 2022, the sum of at least $429,903.24 (the "SoCal Arrears") was outstanding and past due by Exclusive SoCal to Corcoran under the SoCal Franchise Agreement.  The SoCal Arrears exclude any amounts due for unreported transactions, attorney's fees and costs, or obligations under the SoCal Franchise Agreement which may accrue after May18, 2022. By letter dated May 22, 2022, Corcoran noticed Exclusive SoCal and Guarantors of the defaults under the SoCal Franchise Agreement. Despite its receipt of valid and effective notice, Exclusive SoCal has failed to cure the noticed defaults.

130.   Exclusive Las Vegas is in default of its monetary obligations to Corcoran under the Las Vegas Franchise Agreement for failing to pay amounts to Corcoran as and when due under the Las Vegas Franchise Agreement. As of May 18, 2022, the sum of at least $83,028.42 (the "Las Vegas Arrears") was outstanding and past due by Exclusive Las Vegas to Corcoran under the Las Vegas Franchise Agreement. The Las

Vegas Arrears exclude any amounts due for unreported transactions, attorney's fees and costs, or obligations under the Franchise Agreement which may accrue after May 18, 2022.  By letter dated May 22, 2022, Corcoran noticed Exclusive Las Vegas and Guarantors of defaults under the Las Vegas Franchise Agreement. Despite its receipt of valid and effective notice, Exclusive Las Vegas has failed to cure the noticed defaults.

131.   Exclusive Ohio is in default of its monetary obligations to Corcoran under the Franchise Agreement for failing to pay amounts to Corcoran as and when due under the Franchise Agreement. As of May 18, 2022, the sum of <u>at least</u> $88,407.84 (the "<u>Exclusive Ohio Arrears</u>") was outstanding and past due by Exclusive Ohio to Corcoran under the Ohio Franchise Agreement.  The Exclusive Ohio Arrears exclude any amounts due for unreported transactions, attorney's fees and costs, or obligations under the Ohio Franchise Agreement which may accrue after May 18, 2022. By letter dated May 22, 2022, Corcoran noticed Exclusive Ohio and Guarantors of defaults under the Ohio Franchise Agreement. Despite its receipt of valid and effective notice, Exclusive Ohio has failed to cure the noticed defaults.

132.   Upon information and belief, some or all of the JV Franchisees paid ELI Realty, Michael Mahon, and/or Does 1-10 (collectively, the "<u>Franchise Fee Trustees</u>"), undetermined amounts that are due to Corcoran under the JV Franchise Agreements.

133.   Michael Mahon advised Corcoran that amounts due to Corcoran under the JV Franchise Agreements (as well as under the ELI Realty Franchise Agreement) are being held "in escrow".  The so called "escrowed" funds are collectively referred to as the "<u>Franchise Fee Trust Funds</u>".

134.   Michael Mahon refused to disclose: (i) who is holding the funds "in escrow"; (ii) where the "escrow" is being held; (iii) how much is being held in "escrow"; or (iv) the reason for the "escrow" – i.e. why the funds have not been remitted to Corcoran.

**P.** **The Mortgage Company Transfer.**

135.   On or around August 3, 2021, Aim High Capital Partners, LLC ("Aim High Capital") made an initial capital contribution of $800,000 (the "Mortgage Company Capital Contribution") into Aim High Mortgage LLC (the "Mortgage Company") in exchange for a 50% ownership interest in the Mortgage Company.

136.   The members of Aim High Capital are identical to the members of ELI Realty.

137.   The Mortgage Company Capital Contribution was transferred by ELI Realty to Aim High Capital.

138.   There was no consideration paid by Aim High Capital to ELI Realty for the Mortgage Company Capital Contribution.

139.   All or part of the Mortgage Company Capital Contribution was comprised of proceeds of certain of the loans from Corcoran that are evidenced by certain of the Notes.

140.   All or part of the Mortgage Company Capital Contribution was comprised of proceeds of certain of the collateral of Corcoran under the Security Agreements.[9]

**Q.** **The Title Company Transfer.**

141.   Gradus Capital, Inc. ("Gradus Capital") is the sole owner of Innovative Title Company (the "Title Company").

142.   Pursuant to that Stock Purchase Agreement dated December 31, 2021, Aim High Capital obtained a 67% ownership interest in Gradus Capital in exchange for (i) a down payment of undetermined amount (the "Title Company Down Payment"), and (ii) a Promissory Note in the amount of $1,355,000 (the "Title Company Note").

---

[9] Collectively, the "Security Agreements" are the ELI Realty Security Agreement, Exclusive San Francisco Security Agreement, Exclusive SoCal Security Agreement, Exclusive Las Vegas Security Agreement, Exclusive Tahoe Security Agreement, and Exclusive Ohio Security Agreement.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

143.   Upon information and belief, all or some portion of the Title Company Down Payment and sums paid pursuant to the Title Company Note (the "Title Company Transfers") were transferred by ELI Realty to Aim High Capital.

144.   There was no consideration paid by Aim High Capital to ELI Realty for the Title Company Transfers.

145.   All or part of the Title Company Transfers was comprised of proceeds of certain of the loans from Corcoran that are evidenced by certain of the Notes.

146.   All or part of the Title Company Transfers was comprised of proceeds of certain of the collateral of Corcoran under the Security Agreements.

**R.    Distributions, Bonuses and Transfers to Insiders.**

147.   Upon information and belief, ELI Realty paid the following non-exclusive distributions to members, bonuses, and/or other transfers to insiders (or entities owned or controlled by insiders):

| *2020 Payments* | | *2021 Payments* | | *Total* |
|---|---|---|---|---|
| **Matek LLC** | | | | |
| Jan-22 | $85,000.00 | Oct-21 | $70,000.00 | |
| Feb-22 | $46,000.00 | Nov-21 | $74,682.16 | |
| Mar-22 | $34,000.00 | Dec-21 | $89,500.00 | |
| Apr-22 | $61,875.00 | | | |
| **Total** | $226,875.00 | **Total** | $234,182.16 | **$461,057.16** |
| | | | | |
| **Pamela Mahon** | | | | |
| Jan-22 | $35,000.00 | Jan-21 | $18,320.00 | |
| | | Feb-21 | $5,372.00 | |
| | | Mar-21 | $4,634.30 | |
| | | Apr-21 | $3,738.94 | |
| | | May-21 | $1,543.75 | |
| | | Jun-22 | $340.00 | |
| | | Aug-21 | $6,062.94 | |

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

| Total | $35,000.00 | Total | $40,011.83 | **$75,011.83** |
|---|---|---|---|---|
| | | | | |
| **Michael Mahon** | | | | |
| Jan-22 | $26,750.00 | Jan-21 | $26,750.00 | |
| Feb-22 | $26,750.00 | Feb-21 | $26,750.00 | |
| Apr-22 | $15,000.00 | Feb-21 | $9,648.21 | |
| | | Feb-21 | $100,000.00 | |
| | | Mar-21 | $26,750.00 | |
| | | May-21 | $26,750.00 | |
| | | Jun-21 | $26,750.00 | |
| | | Jun-21 | $10,000.00 | |
| | | Jul-21 | $26,750.00 | |
| | | Aug-21 | $26,750.00 | |
| | | Oct-21 | $26,750.00 | |
| | | Nov-21 | $26,750.00 | |
| | | Dec-21 | $9,325.72 | |
| | | Dec-21 | $26,750.00 | |
| | | Dec-21 | $100,000.00 | |
| **Total** | $68,500.00 | **Total** | $496,473.93 | **$564,973.93** |

The aforementioned payments are each individually, an "Insider Transfer" and collectively, the "Insider Transfers".

148.   Upon information and belief, certain proceeds received from the Libertas Agreements were used to fund certain of the Insider Transfers.

149.   Upon information and belief, ELI Realty, Exclusive San Francisco, and Exclusive SoCal sold collateral which had been previously pledged to Corcoran to Libertas in order to, in part, fund the Insider Transfers.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

**S.      The Court Approved Stipulation and Breach Thereof.**

150.    Corcoran sought a Preliminary Injunction in this action enjoining further encumbrance, disposition, conveyance, sale or transfer of collateral of Corcoran to Libertas.

151.    Corcoran's motion was resolved pursuant to that certain *Stipulation Concerning Corcoran Group LLC's Motion for Preliminary Injunction* dated July 14, 2022 (the "Stipulation").   This Court entered an Order on July 15, 2022 resolving Corcoran's Motion for Preliminary Injunction, without prejudice, pursuant to the Stipulation.

152.    The Stipulation states:

*1. From July 13, 2022, through the earlier of entry of further stipulation between Corcoran and Franchisees or order of the Court in the above captioned litigation, Franchisees shall each report all transactions and pay all fees to Corcoran as and when required under the Real Estate Franchise Agreements between Corcoran and each Franchisee (collectively, the "Franchise Agreements"). For each real estate transaction that occurs after July 12, 2022, through the earlier of entry of further stipulation between Corcoran and Franchisees or order of the Court, Franchisees shall report the transaction to Corcoran and pay Corcoran a Royalty Fee (as defined in the Franchise Agreements) on the date of settlement.*

153.    The Stipulation defines the "Franchisees" as ELI Realty and all of the JV Franchisees other than Exclusive Tahoe.

154.    The Franchisees defaulted under the Stipulation by failing to pay Corcoran fees as and when due under the Franchise Agreements after July 12, 2022.

155.    None of the Franchisees requested or obtained relief from the Stipulation from the Court in this action.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD
PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

**T.** **Corcoran's Termination of the ELI Realty Franchise Agreement and Demand for Compliance with the ELI Realty Security Agreement.**

156. By letter dated November 21, 2022 (the "ELI Realty Termination Notice"), Corcoran notified ELI Realty and the Guarantors of termination of the ELI Realty Franchise Agreement effective November 21, 2022 (the "Termination Date") for failure of ELI Realty to cure the defaults noticed in Corcoran's letters of May 22, 2022 or May 26, 2022, as well as for breach of the Stipulation by ELI Realty.

157. In the ELI Realty Termination Notice, Corcoran separately noticed termination of the ELI Realty Franchise Agreement: (i) for the reasons set forth in Corcoran's *Answer, Affirmative Defenses, Counterclaims and Third Party Complaint* filed in this action on June 27, 2022 at Docket No. 12, including the Libertas Agreements, Franchise Fee Trust Funds, Mortgage Company Transfer, Title Company Transfer, and Insider Transfers; (ii) on account of the lawsuit and allegations therein in the matter of *Jessie Rodriguez et. al. vs. Michael Mahon et. al*., pending in the Superior Court of the State of California for the County of Orange, Case No. 30-2022-01282981; and/or (iii) on account of the publication and allegations in the Inman article of Lillian Dickerson dated November 18, 2022 entitled *Corcoran Global Living CEO awash in lawsuits amid agent pay delay*.

158. Corcoran effectively terminated the ELI Realty Franchise Agreement by the ELI Realty Termination Notice.

159. As of the Termination Date, ELI Realty was no longer authorized to use the Corcoran Marks or participate in the Corcoran System.

160. As of the Termination Date, ELI Realty was required to immediately cease and desist use of the Corcoran Marks and Corcoran System.

161. In the ELI Realty Termination Notice, Corcoran demanded that ELI Realty immediately cease and desist use of the Corcoran Marks and Corcoran System.

162.   After its receipt of the ELI Realty Termination Notice, and after the Termination Date, ELI Realty continued to utilize the Corcoran Marks and Corcoran System.

163.   As of the Termination Date, ELI Realty was required to satisfy post-termination obligations provided for in the ELI Realty Franchise Agreement, including but not limited to those set forth in Section 16.4 of the ELI Realty Franchise Agreement, (the "ELI Realty Post Termination Obligations").

164.   In the ELI Realty Termination Notice, Corcoran demanded that ELI Realty satisfy the ELI Realty Post Termination Obligations.

165.   After its receipt of the ELI Realty Termination Notice, and after the Termination Date, ELI Realty refused to comply with the ELI Realty Post Termination Obligations.

166.   After the Termination Date, ELI Realty refused to de-identify its business from apparent affiliation with Corcoran and continued to represent to the public that ELI Realty was affiliated with Corcoran.

167.   As of the Termination Date, ELI Realty remained obligated to pay Corcoran, Royalty Fees, New Development Services Royalty Fees, BMF contributions (all as defined in the ELI Realty Franchise Agreement) and other fees and costs set forth in the ELI Realty Franchise Agreement.

168.   In the ELI Realty Termination Notice, Corcoran demanded immediate payment of $174,397 (the "ELI Realty 10/31 Arrears") in outstanding and past due Royalty Fees and BMF contributions (each as defined in the ELI Realty Franchise Agreement) due under the ELI Realty Franchise Agreement as of October 31, 2022. The ELI Realty 10/31 Arrears exclude (i) any amounts due for unreported transactions or unpaid obligations under the ELI Realty Franchise Agreement which accrued after October 31, 2022; (ii) interest, attorney's fees and costs due under the ELI Realty

Franchise Agreement; (iii) liquidated damages due under the ELI Realty Franchise Agreement; (iv) any amounts due under the ELI Realty Franchise Agreement that are not included in the ELI Realty 10/31 Arrears; and (v) amounts due under the Notes, ELI Realty Security Agreement, or other agreements between Corcoran and ELI Realty.

169.   ELI Realty has failed to pay Corcoran any portion of the ELI Realty 10/31 Arrears.

170.   The ELI Realty Franchise Agreement further provides, at Section 16.7.1 that ELI Realty remains ". . . . obligated to pay [Corcoran] Royalty Fees, New Development Services Royalty Fees, BMF contributions, and referral fees, on transactions pending at the time of expiration, termination or Transfer of the [ELI Realty Franchise Agreement]."

171.   Despite repeated demands from Corcoran, ELI Realty has failed to pay Corcoran any Royalty Fees, New Development Services Royalty Fees, BMF contributions, or referral fees on transactions pending as of the Termination Date.

172.   By separate letter dated November 21, 2022 (the "ELI Realty Collateral Notice"), Corcoran notified ELI Realty and the Guarantors that Corcoran declared all obligations secured by the ELI Realty Security Agreement immediately due and payable.

173.   In the ELI Realty Collateral Notice, Corcoran demanded that ELI Realty assemble Corcoran's collateral and the records pertaining to the collateral and make same available for Corcoran's inspection.  ELI Realty failed to comply with Corcoran's demand.

174.   In the ELI Realty Collateral Notice, Corcoran also noticed ELI Realty that:

*Other than for payment to Corcoran of amounts due under the ELI Realty Franchise Agreement, Corcoran objects to any further use of its Collateral, or any proceeds of its Collateral, by ELI Realty without prior written authorization of Corcoran. Corcoran therefore directs ELI Realty to refrain*

46

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD
PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

*from any use, disposition, conveyance or transfer of the Collateral, or any
proceeds of the Collateral, other than for payment to Corcoran for amounts
due under the ELI Realty Franchise Agreement, without first obtaining written
consent of Corcoran.*

175.   Since the date of the ELI Realty Collateral Notice, ELI Realty has failed
to remit to Corcoran any of Corcoran's collateral or the proceeds thereof.

176.   Despite repeated admonitions from Corcoran, after the date of the ELI
Realty Collateral Notice, ELI Realty and undetermined individuals and/or entities have
utilized, disposed of, conveyed, and/or transferred collateral of Corcoran and the
proceeds of collateral of Corcoran without consent of Corcoran.

**U.**   **Corcoran's Termination of the San Francisco Franchise Agreement and
Demand for Compliance with the Exclusive San Francisco Security Agreement.**

177.   By letter dated November 21, 2022 (the "<u>Exclusive San Francisco
Termination Notice</u>"), Corcoran notified Exclusive San Francisco and the Guarantors
of termination of the San Francisco Franchise Agreement effective November 21, 2022
(the "<u>Termination Date</u>") for failure of Exclusive San Francisco to cure the defaults
noticed in Corcoran's letters of May 22, 2022 or May 26, 2022, as well as for breach of
the Stipulation by Exclusive San Francisco.

178.   In the Exclusive San Francisco Termination Notice, Corcoran separately
noticed termination of the San Francisco Franchise Agreement: (i) for the reasons set
forth in Corcoran's *Answer, Affirmative Defenses, Counterclaims and Third Party
Complaint* filed in this action on June 27, 2022 at Docket No. 12, including the Libertas
Agreements, Franchise Fee Trust Funds, Mortgage Company Transfer, Title Company
Transfer, and Insider Transfers; (ii) on account of the lawsuit and allegations therein in
the matter of *Jessie Rodriguez et. al. vs. Michael Mahon et. al*., pending in the Superior
Court of the State of California for the County of Orange, Case No. 30-2022-01282981;
and/or (iii) on account of the publication and allegations in the Inman article of Lillian

47

Dickerson dated November 18, 2022 entitled *Corcoran Global Living CEO awash in lawsuits amid agent pay delay*.

179.   Corcoran effectively terminated the San Francisco Franchise Agreement by the Exclusive San Francisco Termination Notice.

180.   As of the Termination Date, Exclusive San Francisco was no longer authorized to use the Corcoran Marks or participate in the Corcoran System.

181.   As of the Termination Date, Exclusive San Francisco was required to immediately cease and desist use of the Corcoran Marks and Corcoran System.

182.   In the Exclusive San Francisco Termination Notice, Corcoran demanded that Exclusive San Francisco immediately cease and desist use of the Corcoran Marks and Corcoran System.

183.   After its receipt of the Exclusive San Francisco Termination Notice, and after the Termination Date, Exclusive San Francisco continued to utilize the Corcoran Marks and Corcoran System.

184.   As of the Termination Date, Exclusive San Francisco was required to satisfy post-termination obligations provided for in the San Francisco Franchise Agreement, including but not limited to those set forth in Section 16.4 of the San Francisco Franchise Agreement, (the "Exclusive San Francisco Post Termination Obligations").

185.   In the Exclusive San Francisco Termination Notice, Corcoran demanded that Exclusive San Francisco satisfy the Exclusive San Francisco Post Termination Obligations.

186.   After its receipt of the Exclusive San Francisco Termination Notice, and after the Termination Date, Exclusive San Francisco refused to comply with the Exclusive San Francisco Post Termination Obligations.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

187.   After the Termination Date, Exclusive San Francisco refused to de-identify its business from apparent affiliation with Corcoran and continued to represent to the public that Exclusive San Francisco was affiliated with Corcoran.

188.   As of the Termination Date, Exclusive San Francisco remained obligated to pay Corcoran, Royalty Fees, New Development Services Royalty Fees, BMF contributions (all as defined in the San Francisco Franchise Agreement) and other fees and costs set forth in the San Francisco Franchise Agreement.

189.   In the Exclusive San Francisco Termination Notice, Corcoran demanded immediate payment of $1,703,699 (the "Exclusive San Francisco 10/31 Arrears") in outstanding and past due Royalty Fees and BMF contributions (each as defined in the San Francisco Franchise Agreement) due under the San Francisco Franchise Agreement as of October 31, 2022. The Exclusive San Francisco 10/31 Arrears exclude (i) any amounts due for unreported transactions or unpaid obligations under the San Francisco Franchise Agreement which accrued after October 31, 2022; (ii) interest, attorney's fees and costs due under the San Francisco Franchise Agreement; (iii) liquidated damages due under the San Francisco Franchise Agreement; (iv) any amounts due under the San Francisco Franchise Agreement that are not included in the Exclusive San Francisco 10/31 Arrears; and (v) amounts due under the Notes, San Francisco Security Agreement, or other agreements between Corcoran and Exclusive San Francisco.

190.   Exclusive San Francisco has failed to pay Corcoran any portion of the Exclusive San Francisco 10/31 Arrears.

191.   The San Francisco Franchise Agreement further provides, at Section 16.7.1 that Exclusive San Francisco remains ". . . . obligated to pay [Corcoran] Royalty Fees, New Development Services Royalty Fees, BMF contributions, and referral fees, on transactions pending at the time of expiration, termination or Transfer of the [San Francisco Franchise Agreement]."

192.   Despite repeated demands from Corcoran, Exclusive San Francisco has failed to pay Corcoran any Royalty Fees, New Development Services Royalty Fees, BMF contributions, or referral fees on transactions pending as of the Termination Date.

193.   By separate letter dated November 21, 2022 (the "Exclusive San Francisco Collateral Notice"), Corcoran notified Exclusive San Francisco and the Guarantors that Corcoran declared all obligations secured by the Exclusive San Francisco Security Agreement immediately due and payable.

194.   In the Exclusive San Francisco Collateral Notice, Corcoran demanded that Exclusive San Francisco assemble Corcoran's collateral and the records pertaining to the collateral and make same available for Corcoran's inspection.   Exclusive San Francisco failed to comply with Corcoran's demand.

195.   In the Exclusive San Francisco Collateral Notice, Corcoran also noticed Exclusive San Francisco that:

*Other than for payment to Corcoran of amounts due under the San Francisco Franchise Agreement, Corcoran objects to any further use of its Collateral, or any proceeds of its Collateral, by Exclusive San Francisco without prior written authorization of Corcoran. Corcoran therefore directs Exclusive San Francisco to refrain from any use, disposition, conveyance or transfer of the Collateral, or any proceeds of the Collateral, other than for payment to Corcoran for amounts due under the San Francisco Franchise Agreement, without first obtaining written consent of Corcoran.*

196.   Since the date of the Exclusive San Francisco Collateral Notice, Exclusive San Francisco has failed to remit to Corcoran any Corcoran's collateral or the proceeds thereof.

197.   Despite repeated admonitions from Corcoran, after the date of the Exclusive San Francisco Collateral Notice, Exclusive San Francisco and undetermined individuals and/or entities have utilized, disposed of, conveyed, and/or transferred collateral of Corcoran and the proceeds of collateral of Corcoran without consent of Corcoran.

**V.      Corcoran's Termination of the SoCal Franchise Agreement and Demand for Compliance with the Exclusive SoCal Security Agreement.**

198.   By letter dated November 21, 2022 (the "Exclusive SoCal Termination Notice"), Corcoran notified Exclusive SoCal and the Guarantors of termination of the SoCal Franchise Agreement effective November 21, 2022 (the "Termination Date") for the failure of Exclusive SoCal to cure the defaults noticed in Corcoran's letters of May 22, 2022 or May 26, 2022, as well as for breach of the Stipulation by Exclusive SoCal.

199.   In the Exclusive SoCal Termination Notice, Corcoran separately noticed termination of the SoCal Franchise Agreement: (i) for the reasons set forth in Corcoran's *Answer, Affirmative Defenses, Counterclaims and Third Party Complaint* filed in this action on June 27, 2022 at Docket No. 12, including the Libertas Agreements, Franchise Fee Trust Funds, Mortgage Company Transfer, Title Company Transfer, and Insider Transfers; (ii) on account of the lawsuit and allegations therein in the matter of *Jessie Rodriguez et. al. vs. Michael Mahon et. al*., pending in the Superior Court of the State of California for the County of Orange, Case No. 30-2022-01282981; and/or (iii) on account of the publication and allegations in the Inman article by Lillian Dickerson dated November 18, 2022 entitled *Corcoran Global Living CEO Awash in Lawsuits Amid Agent Pay Delay*.

200.   Corcoran effectively terminated the SoCal Franchise Agreement by the Exclusive SoCal Termination Notice.

201.   As of the Termination Date, Exclusive SoCal was no longer authorized to use the Corcoran Marks or participate in the Corcoran System.

202.   As of the Termination Date, Exclusive SoCal was required to immediately cease and desist use of the Corcoran Marks and Corcoran System.

203.   In the Exclusive SoCal Termination Notice, Corcoran demanded that Exclusive SoCal immediately cease and desist use of the Corcoran Marks and Corcoran System.

204.   After its receipt of the Exclusive SoCal Termination Notice, and after the Termination Date, Exclusive SoCal continued to utilize the Corcoran Marks and Corcoran System.

205.   As of the Termination Date, Exclusive SoCal was required to satisfy post-termination obligations provided for in the SoCal Franchise Agreement, including but not limited to those set forth in Section 16.4 of the SoCal Franchise Agreement, (the "Exclusive SoCal Post Termination Obligations").

206.   In the Exclusive SoCal Termination Notice, Corcoran demanded that Exclusive SoCal satisfy the Exclusive SoCal Post Termination Obligations.

207.       206.   After its receipt of the Exclusive SoCal Termination Notice, and after the Termination Date, Exclusive SoCal refused to comply with the Exclusive SoCal Post Termination Obligations.

208.   After the Termination Date, Exclusive SoCal refused to de-identify its business from apparent affiliation with Corcoran and continued to represent to the public that Exclusive SoCal was affiliated with Corcoran.

209.   As of the Termination Date, Exclusive SoCal remained obligated to pay Corcoran, Royalty Fees, New Development Services Royalty Fees, BMF contributions (all as defined in the SoCal Franchise Agreement) and other fees and costs set forth in the SoCal Franchise Agreement.

210.   In the Exclusive SoCal Termination Notice, Corcoran demanded immediate payment of $1,298,066 (the "Exclusive SoCal 10/31 Arrears") in outstanding and past due Royalty Fees and BMF contributions (each as defined in the SoCal Franchise Agreement) due under the SoCal Franchise Agreement as of October 31, 2022. The

Exclusive SoCal 10/31 Arrears exclude (i) any amounts due for unreported transactions or unpaid obligations under the SoCal Franchise Agreement which accrued after October 31, 2022; (ii) interest, attorney's fees and costs due under the SoCal Franchise Agreement; (iii) liquidated damages due under the SoCal Franchise Agreement; (iv) any amounts due under the SoCal Franchise Agreement that are not included in the Exclusive SoCal 10/31 Arrears; and (v) amounts due under the Notes, SoCal Security Agreement, or other agreements between Corcoran and Exclusive SoCal.

211.   Exclusive SoCal has failed to pay Corcoran any portion of the Exclusive SoCal 10/31 Arrears.

212.   The SoCal Franchise Agreement further provides, at Section 16.7.1 that Exclusive SoCal remains ". . . . obligated to pay [Corcoran] Royalty Fees, New Development Services Royalty Fees, BMF contributions, and referral fees, on transactions pending at the time of expiration, termination or Transfer of the [SoCal Franchise Agreement]."

213.   Despite repeated demands from Corcoran, Exclusive SoCal has failed to pay Corcoran any Royalty Fees, New Development Services Royalty Fees, BMF contributions, or referral fees on transactions pending as of the Termination Date.

214.   By separate letter dated November 21, 2022 (the "Exclusive SoCal Collateral Notice"), Corcoran notified Exclusive SoCal and the Guarantors that Corcoran declared all obligations secured by the Exclusive SoCal Security Agreement immediately due and payable.

215.   In the Exclusive SoCal Collateral Notice, Corcoran demanded that Exclusive SoCal assemble Corcoran's collateral and the records pertaining to the collateral and make same available for Corcoran's inspection.  Exclusive SoCal failed to comply with Corcoran's demand.

216.   In the Exclusive SoCal Collateral Notice, Corcoran also noticed Exclusive SoCal that:

> *Other than for payment to Corcoran of amounts due under the SoCal Franchise Agreement, Corcoran objects to any further use of its Collateral, or any proceeds of its Collateral, by Exclusive SoCal without prior written authorization of Corcoran. Corcoran therefore directs Exclusive SoCal to refrain from any use, disposition, conveyance or transfer of the Collateral, or any proceeds of the Collateral, other than for payment to Corcoran for amounts due under the SoCal Franchise Agreement, without first obtaining written consent of Corcoran.*

217.   Since the date of the Exclusive SoCal Collateral Notice, Exclusive SoCal has failed to remit to Corcoran any Corcoran's collateral or the proceeds thereof.

218.   Despite repeated admonitions from Corcoran, after the date of the Exclusive SoCal Collateral Notice, Exclusive SoCal and undetermined individuals and/or entities have utilized, disposed of, conveyed, and/or transferred collateral of Corcoran and the proceeds of collateral of Corcoran without consent of Corcoran.

**W.    Corcoran's Termination of the Ohio Franchise Agreement and Demand for Compliance with the Exclusive Ohio Security Agreement.**

219.   By letter dated November 21, 2022 (the "Exclusive Ohio Termination Notice"), Corcoran notified Exclusive Ohio and the Guarantors of termination of the Ohio Franchise Agreement effective November 21, 2022 (the "Termination Date") for failure of Exclusive Ohio to cure the defaults noticed in Corcoran's letter of May 22, 2022, as well as for breach of the Stipulation by Exclusive Ohio.

220.   In the Exclusive Ohio Termination Notice, Corcoran separately noticed termination of the Ohio Franchise Agreement: (i) for the reasons set forth in Corcoran's *Answer, Affirmative Defenses, Counterclaims and Third Party Complaint* filed in this action on June 27, 2022 at Docket No. 12, including the Libertas Agreements, Franchise

Fee Trust Funds, Mortgage Company Transfer, Title Company Transfer, and Insider Transfers; (ii) on account of the lawsuit and allegations therein in the matter of *Jessie Rodriguez et. al. vs. Michael Mahon et. al*., pending in the Superior Court of the State of California for the County of Orange, Case No. 30-2022-01282981; and/or (iii) on account of the publication and allegations in the Inman article of Lillian Dickerson dated November 18, 2022 entitled *Corcoran Global Living CEO awash in lawsuits amid agent pay delay*.

221.   Corcoran effectively terminated the Ohio Franchise Agreement by the Exclusive Ohio Termination Notice.

222.   As of the Termination Date, Exclusive Ohio was no longer authorized to use the Corcoran Marks or participate in the Corcoran System.

223.   As of the Termination Date, Exclusive Ohio was required to immediately cease and desist use of the Corcoran Marks and Corcoran System.

224.   In the Exclusive Ohio Termination Notice, Corcoran demanded that Exclusive Ohio immediately cease and desist use of the Corcoran Marks and Corcoran System.

225.   After its receipt of the Exclusive Ohio Termination Notice, and after the Termination Date, Exclusive Ohio continued to utilize the Corcoran Marks and Corcoran System.

226.   As of the Termination Date, Exclusive Ohio was required to satisfy post-termination obligations provided for in the Ohio Franchise Agreement, including but not limited to those set forth in Section 16.4 of the Ohio Franchise Agreement, (the "Exclusive Ohio Post Termination Obligations").

227.   In the Exclusive Ohio Termination Notice, Corcoran demanded that Exclusive Ohio satisfy the Exclusive Ohio Post Termination Obligations.

228.   After its receipt of the Exclusive Ohio Termination Notice, and after the Termination Date, Exclusive Ohio refused to comply with the Exclusive Ohio Post Termination Obligations.

229.   After the Termination Date, Exclusive Ohio refused to de-identify its business from apparent affiliation with Corcoran and continued to represent to the public that Exclusive Ohio was affiliated with Corcoran.

230.   As of the Termination Date, Exclusive Ohio remained obligated to pay Corcoran, Royalty Fees, New Development Services Royalty Fees, BMF contributions (all as defined in the Ohio Franchise Agreement) and other fees and costs set forth in the Ohio Franchise Agreement.

231.   In the Exclusive Ohio Termination Notice, Corcoran demanded immediate payment of $383,993 (the "Exclusive Ohio 10/31 Arrears") in outstanding and past due Royalty Fees and BMF contributions (each as defined in the Ohio Franchise Agreement) due under the Ohio Franchise Agreement as of October 31, 2022. The Exclusive Ohio 10/31 Arrears exclude (i) any amounts due for unreported transactions or unpaid obligations under the Ohio Franchise Agreement which accrued after October 31, 2022; (ii) interest, attorney's fees and costs due under the Ohio Franchise Agreement; (iii) liquidated damages due under the Ohio Franchise Agreement; (iv) any amounts due under the Ohio Franchise Agreement that are not included in the Exclusive Ohio 10/31 Arrears; and (v) amounts due under the Notes, Ohio Security Agreement, or other agreements between Corcoran and Exclusive Ohio.

232.   Exclusive Ohio has failed to pay Corcoran any portion of the Exclusive Ohio 10/31 Arrears.

233.   The Ohio Franchise Agreement further provides, at Section 16.7.1 that Exclusive Ohio remains ". . . . obligated to pay [Corcoran] Royalty Fees, New Development Services Royalty Fees, BMF contributions, and referral fees, on

transactions pending at the time of expiration, termination or Transfer of the [Ohio Franchise Agreement]."

234.   Despite repeated demands from Corcoran, Exclusive Ohio has failed to pay Corcoran any Royalty Fees, New Development Services Royalty Fees, BMF contributions, or referral fees on transactions pending as of the Termination Date.

235.   By separate letter dated November 21, 2022 (the "Exclusive Ohio Collateral Notice"), Corcoran notified Exclusive Ohio and the Guarantors that Corcoran declared all obligations secured by the Exclusive Ohio Security Agreement immediately due and payable.

236.   In the Exclusive Ohio Collateral Notice, Corcoran demanded that Exclusive Ohio assemble Corcoran's collateral and the records pertaining to the collateral and make same available for Corcoran's inspection.  Exclusive Ohio failed to comply with Corcoran's demand.

237.   In the Exclusive Ohio Collateral Notice, Corcoran also noticed Exclusive Ohio that:

> *Other than for payment to Corcoran of amounts due under the Ohio Franchise Agreement, Corcoran objects to any further use of its Collateral, or any proceeds of its Collateral, by Exclusive Ohio without prior written authorization of Corcoran. Corcoran therefore directs Exclusive Ohio to refrain from any use, disposition, conveyance or transfer of the Collateral, or any proceeds of the Collateral, other than for payment to Corcoran for amounts due under the Ohio Franchise Agreement, without first obtaining written consent of Corcoran.*

238.   Since the date of the Exclusive Ohio Collateral Notice, Exclusive Ohio has failed to remit to Corcoran any Corcoran's collateral or the proceeds thereof.

239.   Despite repeated admonitions from Corcoran, after the date of the Exclusive Ohio Collateral Notice, Exclusive Ohio and undetermined individuals and/or

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD
PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

entities have utilized, disposed of, conveyed, and/or transferred collateral of Corcoran and the proceeds of collateral of Corcoran without consent of Corcoran.

## X.    Corcoran's Termination of the Las Vegas Franchise Agreement and Demand for Compliance with the Exclusive Las Vegas Security Agreement.

240.    By letter dated November 21, 2022 (the "Exclusive Las Vegas Termination Notice"), Corcoran notified Exclusive Las Vegas and the Guarantors of termination of the Las Vegas Franchise Agreement effective November 21, 2022 (the "Termination Date") for failure of Exclusive Las Vegas to cure the defaults noticed in Corcoran's letter of May 22, 2022, as well as for breach of the Stipulation by Exclusive Las Vegas.

241.    n the Exclusive Las Vegas Termination Notice, Corcoran separately noticed termination of the Las Vegas Franchise Agreement: (i) for the reasons set forth in Corcoran's *Answer, Affirmative Defenses, Counterclaims and Third Party Complaint* filed in this action on June 27, 2022 at Docket No. 12, including the Libertas Agreements, Franchise Fee Trust Funds, Mortgage Company Transfer, Title Company Transfer, and Insider Transfers; (ii) on account of the lawsuit and allegations therein in the matter of *Jessie Rodriguez et. al. vs. Michael Mahon et. al*., pending in the Superior Court of the State of California for the County of Orange, Case No. 30-2022-01282981; and/or (iii) on account of the publication and allegations in the Inman article of Lillian Dickerson dated November 18, 2022 entitled *Corcoran Global Living CEO awash in lawsuits amid agent pay delay*.

242.    Corcoran effectively terminated the Las Vegas Franchise Agreement by the Exclusive Las Vegas Termination Notice.

243.    As of the Termination Date, Exclusive Las Vegas was no longer authorized to use the Corcoran Marks or participate in the Corcoran System.

244.    As of the Termination Date, Exclusive Las Vegas was required to immediately cease and desist use of the Corcoran Marks and Corcoran System.

245.   In the Exclusive Las Vegas Termination Notice, Corcoran demanded that Exclusive Las Vegas immediately cease and desist use of the Corcoran Marks and Corcoran System.

246.   After its receipt of the Exclusive Las Vegas Termination Notice, and after the Termination Date, Exclusive Las Vegas continued to utilize the Corcoran Marks and Corcoran System.

247.   As of the Termination Date, Exclusive Las Vegas was required to satisfy post-termination obligations provided for in the Las Vegas Franchise Agreement, including but not limited to those set forth in Section 16.4 of the Las Vegas Franchise Agreement, (the "Exclusive Las Vegas Post Termination Obligations").

248.   In the Exclusive Las Vegas Termination Notice, Corcoran demanded that Exclusive Las Vegas satisfy the Exclusive Las Vegas Post Termination Obligations.

249.   After its receipt of the Exclusive Las Vegas Termination Notice, and after the Termination Date, Exclusive Las Vegas refused to comply with the Exclusive Las Vegas Post Termination Obligations.

250.   After the Termination Date, Exclusive Las Vegas refused to de-identify its business from apparent affiliation with Corcoran and continued to represent to the public that Exclusive Las Vegas was affiliated with Corcoran.

251.   As of the Termination Date, Exclusive Las Vegas remained obligated to pay Corcoran, Royalty Fees, New Development Services Royalty Fees, BMF contributions (all as defined in the Las Vegas Franchise Agreement) and other fees and costs set forth in the Las Vegas Franchise Agreement.

252.   In the Exclusive Las Vegas Termination Notice, Corcoran demanded immediate payment of $447,270 (the "Exclusive Las Vegas 10/31 Arrears") in outstanding and past due Royalty Fees and BMF contributions (each as defined in the Las Vegas Franchise Agreement) due under the Las Vegas Franchise Agreement as of

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

October 31, 2022. The Exclusive Las Vegas 10/31 Arrears exclude (i) any amounts due for unreported transactions or unpaid obligations under the Las Vegas Franchise Agreement which accrued after October 31, 2022; (ii) interest, attorney's fees and costs due under the Las Vegas Franchise Agreement; (iii) liquidated damages due under the Las Vegas Franchise Agreement; (iv) any amounts due under the Las Vegas Franchise Agreement that are not included in the Exclusive Las Vegas 10/31 Arrears; and (v) amounts due under the Notes, Las Vegas Security Agreement, or other agreements between Corcoran and Exclusive Las Vegas.

253.   Exclusive Las Vegas has failed to pay Corcoran any portion of the Exclusive Las Vegas 10/31 Arrears.

254.   The Las Vegas Franchise Agreement further provides, at Section 16.7.1 that Exclusive Las Vegas remains ". . . . obligated to pay [Corcoran] Royalty Fees, New Development Services Royalty Fees, BMF contributions, and referral fees, on transactions pending at the time of expiration, termination or Transfer of the [Las Vegas Franchise Agreement]."

255.   Despite repeated demands from Corcoran, Exclusive Las Vegas has failed to pay Corcoran any Royalty Fees, New Development Services Royalty Fees, BMF contributions, or referral fees on transactions pending as of the Termination Date.

256.   By separate letter dated November 21, 2022 (the "Exclusive Las Vegas Collateral Notice"), Corcoran notified Exclusive Las Vegas and the Guarantors that Corcoran declared all obligations secured by the Exclusive Las Vegas Security Agreement immediately due and payable.

257.   In the Exclusive Las Vegas Collateral Notice, Corcoran demanded that Exclusive Las Vegas assemble Corcoran's collateral and the records pertaining to the collateral and make same available for Corcoran's inspection.  Exclusive Las Vegas failed to comply with Corcoran's demand.

258.   In the Exclusive Las Vegas Collateral Notice, Corcoran also noticed Exclusive Las Vegas that:

> *Other than for payment to Corcoran of amounts due under the Las Vegas Franchise Agreement, Corcoran objects to any further use of its Collateral, or any proceeds of its Collateral, by Exclusive Las Vegas without prior written authorization of Corcoran. Corcoran therefore directs Exclusive Las Vegas to refrain from any use, disposition, conveyance or transfer of the Collateral, or any proceeds of the Collateral, other than for payment to Corcoran for amounts due under the Las Vegas Franchise Agreement, without first obtaining written consent of Corcoran.*

259.   Since the date of the Exclusive Las Vegas Collateral Notice, Exclusive Las Vegas has failed to remit to Corcoran any Corcoran's collateral or the proceeds thereof.

260.   Despite repeated admonitions from Corcoran, after the date of the Exclusive Las Vegas Collateral Notice, Exclusive Las Vegas and undetermined individuals and/or entities have utilized, disposed of, conveyed, and/or transferred collateral of Corcoran and the proceeds of collateral of Corcoran without consent of Corcoran.

**Y.   Corcoran's Termination of the Tahoe Franchise Agreement.**

261.   By letter dated November 21, 2022 (the "Exclusive Tahoe Termination Notice"), Corcoran notified Exclusive Tahoe and the Guarantors of termination of the Tahoe Franchise Agreement effective November 21, 2022 (the "Termination Date").

262.   Corcoran effectively terminated the Tahoe Franchise Agreement by the Exclusive Tahoe Termination Notice.

263.   As of the Termination Date, Exclusive Tahoe was required to satisfy post-termination obligations provided for in the Tahoe Franchise Agreement, including but not limited to those set forth in Section 16.4 of the Tahoe Franchise Agreement, (the "Exclusive Tahoe Post Termination Obligations").

264.   In the Exclusive Tahoe Termination Notice, Corcoran demanded that Exclusive Tahoe satisfy the Exclusive Tahoe Post Termination Obligations. After its receipt of the Exclusive Tahoe Termination Notice, and after the Termination Date, Exclusive Tahoe did not comply with the Exclusive Tahoe Post Termination Obligations.

## FIRST COUNT

### (Accounting: ELI Realty)

265.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

266.   The ELI Realty Franchise Agreement requires ELI Realty to report transactions to Corcoran on the date of settlement (closing) and pay certain fees to Corcoran based upon those reported transactions.

267.   The Stipulation also requires ELI Realty to report transactions to Corcoran and pay certain fees to Corcoran based upon those reported transactions as and when required under the ELI Realty Franchise Agreement.

268.   ELI Realty has failed to report transactions to Corcoran as and when required under the ELI Realty Franchise Agreement and Stipulation.

269.   Corcoran has demanded an accurate accounting and reporting of all transactions from ELI Realty, as required under the ELI Realty Franchise Agreement and Stipulation. ELI Realty has refused to provide the required reporting, has provided inaccurate information, and/or has not provided information as required in the ELI Realty Franchise Agreement and Stipulation.

270.   A complete calculation of the money damages of Corcoran cannot be ascertained without reporting and an accounting by ELI Realty of all transactions of ELI Realty, as required under the ELI Realty Franchise Agreement and Stipulation.

271.   The ELI Realty Franchise Agreement requires ELI Realty, at Sections 11.6 and 13, to maintain records, including a complete and current inventory of all listings and pending transactions. Despite demand, ELI Realty has not provided Corcoran with a complete and current inventory of all listings and pending transactions as of the Termination Date or thereafter.

272.   271. After and Event of Default, the ELI Realty Security Agreement requires ELI Realty to assemble the collateral of Corcoran identified in the ELI Realty Security Agreement (the "Corcoran-ELI Realty Collateral") and make same available to Corcoran. Despite demand from Corcoran, ELI Realty has refused to provide Corcoran with documents identifying the Corcoran-ELI Realty Collateral or the status of the Corcoran-ELI Realty Collateral.

**WHEREFORE**, Corcoran demands judgment directing ELI Realty Investments, LLC to accurately account and report to Corcoran: (i) all unreported reported transactions as required under the ELI Realty Franchise Agreement; (ii) all unreported reported transactions of the JV Franchisees, as required under the JV Franchise Agreements, to the extent that such information is in the custody and/or control of ELI Realty; (iii) a complete inventory of all listings and pending transactions as of the Termination Date and thereafter; (iv) the identity, location and disposition of all of the Corcoran-ELI Realty Collateral as of and subsequent to the Termination Date; and (v) such other and further relief that this Court deems just and proper.

## SECOND COUNT

### (Breach of Contract: ELI Realty Franchise Agreement)

273.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

274.   Pursuant to the terms of the ELI Realty Franchise Agreement, Corcoran agreed to provide ELI Realty with a non-exclusive license to use the Corcoran Marks

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

and Corcoran System and ELI Realty agreed to certain monetary and non-monetary obligations as more fully set forth in the ELI Realty Franchise Agreement.

275.   Corcoran performed all conditions, covenants, and promises required on its part in accordance with the terms and conditions of the ELI Realty Franchise Agreement.

276.   ELI Realty breached the ELI Realty Franchise Agreement by, among other things, failing to pay Royalty Fees, Brand Marketing Fund contributions, and other fees as and when required under the ELI Realty Franchise Agreement.

277.   As a result of ELI Realty's breach of the ELI Realty Franchise Agreement, Corcoran effectively terminated the ELI Realty Franchise Agreement as of the Termination Date as set forth in the ELI Realty Termination Notice.

278.   As a result of ELI Realty's breach of the ELI Realty Franchise Agreement, and Corcoran's termination of the ELI Realty Franchise Agreement, Corcoran has been damaged in amount of: (i) the ELI Realty 10/31 Arrears of at least $174,397; (ii) Royalty Fees, New Development Services Royalty Fees, and BMF contributions that are not included in the ELI Realty 10/31 Arrears, in amounts that are proven at trial, including (a) amounts due for Royalty Fees, New Development Services Royalty Fees, BMF contributions, or referral fees on transactions pending as of the Termination Date, and (b) amounts due on account of unreported transactions by ELI Realty; (iii) liquidated damages due under the ELI Realty Franchise Agreement in an amount to be proven at trial; (iv) interest, attorney's fees and costs due under the ELI Realty Franchise Agreement in amounts to be proven at trial; plus (v) any additional amounts due under the ELI Realty Franchise Agreement that are proven at trial based on the facts alleged herein.

**WHEREFORE**, Corcoran demands judgment against ELI Realty Investments, LLC for all sums due under the ELI Realty Franchise Agreement proven at trial,

including (i) the ELI Realty 10/31 Arrears of at least $174,397; (ii) Royalty Fees, New Development Services Royalty Fees, and BMF contributions that are not included in the ELI Realty 10/31 Arrears, in amounts that are proven at trial, including (a) amounts due for Royalty Fees, New Development Services Royalty Fees, BMF contributions, or referral fees on transactions pending as of the Termination Date, and (b) amounts due on account of unreported transactions by ELI Realty; (iii) liquidated damages due under the ELI Realty Franchise Agreement in an amount to be proven at trial; (iv) interest, attorney's fees and costs due under the ELI Realty Franchise Agreement in amounts to be proven at trial; plus (v) any additional amounts due under the ELI Realty Franchise Agreement that are proven at trial based on the facts alleged herein; and (vi) for such other and further relief that this Court deems just and proper.

## **THIRD COUNT**

### **(Breach of Contract: Notes)**

279.   Corcoran repeats and makes a part hereto each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

280.   Corcoran is the holder of the Notes, which were executed and conveyed by ELI Realty.

281.   Corcoran performed all conditions, covenants, and promises required on its part in accordance with the terms and conditions of the Notes.

282.   Borrowers breached the terms of the Notes as set forth herein.

283.   Corcoran has accelerated and demanded payment from ELI Realty of all amounts due under the Notes, and ELI Realty has failed to pay the same.

284.   As a result of ELI Realty's breach of the Notes, Corcoran has been damaged in the amount of the collective unamortized principal balance due and owing under the Notes, plus interest, fees and costs as provided for in the Notes.

**WHEREFORE**, Corcoran demands judgment against ELI Realty Investments, LLC (i) in the amount of the collective unamortized principal balance due and owing under the Notes, plus interest, attorneys' fees, and costs as provided for in the Notes; and (ii) for such other and further relief that this Court deems just and proper.

## FOURTH COUNT

### (Breach of Contract: ELI Realty Security Agreement)

285.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

286.   Corcoran performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the ELI Realty Security Agreement, if any.

287.   ELI Realty breached the ELI Realty Security Agreement by, among other things, selling or otherwise disposing of Corcoran-ELI Realty Collateral outside of the ordinary course of its business by entering into the Libertas Agreements and consummating the transactions described therein, including the payment of Future Receipts to Libertas.

288.   ELI Realty also breached the ELI Realty Security Agreement by, among other things, (i) failing to property maintain and care for the Corcoran-ELI Realty Collateral, (ii) failing to assemble the Corcoran-ELI Realty Collateral as directed by Corcoran, and (iii) utilizing, commingling, disposing of, conveying, and/or transferring Corcoran-ELI Realty Collateral and the proceeds thereof without consent of Corcoran. Corcoran reserves its rights to assert additional claims related to any unlawful transfer of any of the Corcoran-ELI Realty Collateral to any person or entity.

289.   As a result of ELI Realty's breaches of the ELI Realty Security Agreement, Corcoran has been damaged in an amount to be determined at trial.

**WHEREFORE**, Corcoran demands judgment against ELI Realty Investments, LLC: (i) in an amount to be determined at trial, plus interest, attorneys' fees, and costs; (ii) directing ELI Realty to assemble Corcoran- ELI Realty Collateral as designated by Corcoran and make same available to Corcoran; (iii) prohibiting ELI Realty from using Corcoran-ELI Realty Collateral, or any proceeds of the Corcoran-ELI Realty Collateral, for payment to Libertas any other individual or entity without the written consent of Corcoran and/or from utilizing, commingling, disposing of, conveying, and/or transferring Corcoran-ELI Realty Collateral or the proceeds thereof without consent of Corcoran; (iv) compelling ELI Realty to remit the proceeds of Corcoran-ELI Realty Collateral to Corcoran; and (v) for such other and further relief that this Court deems just and proper.

## FIFTH COUNT

### (Unjust Enrichment: ELI Realty)

290.  Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

291.  During the course of the ELI Realty Franchise Agreement, Corcoran provided services to ELI Realty, which services included but were not limited to non-exclusive license to use the Corcoran Marks and participate in the Corcoran System. ELI Realty knew that these services were being provided by Corcoran and accepted them and used them.

292.  Despite its obligation to do so, ELI Realty failed to pay certain Royalty Fees, Brand Marketing Fund contributions, and other fees to Corcoran due and owing under the ELI Realty Franchise Agreement but has continuously continued to use the Corcoran Marks.

293.  ELI Realty's failure to compensate Corcoran constitutes unjust enrichment and has damaged Corcoran in an undetermined amount.

**WHEREFORE**, Corcoran demands judgment against ELI Realty Investments, LLC (i) in an amount to be determined at trial, together with interest, attorneys' fees, and costs; and (ii) such other and further relief that this Court deems just and proper.

## SIXTH COUNT

### (Breach of Contract: ELI Realty Guaranty)

294. Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

295. Pursuant to the terms of the ELI Realty Guaranty, the Guarantors agreed to, among other things, guaranty to Corcoran the prompt payment and performance under the ELI Realty Franchise Agreement, Notes, and all other agreements between the parties, including the ELI Realty Security Agreement.

296. Guarantors breached their obligations under the ELI Realty Guaranty by failing to make payments or perform the obligations due Corcoran under the ELI Realty Franchise Agreement, Notes, and/or ELI Realty Security Agreement.

297. Corcoran has demanded payment and performance from Guarantors under the ELI Realty Guaranty, and Guarantors have failed to pay or perform as they are obligated to do.

298. As a result of Guarantors breach of the ELI Realty Guaranty, Corcoran has been damaged in the amount of: (i) all sums due under the ELI Realty Franchise Agreement proven at trial, including interest, attorney's fees, and costs set forth in the ELI Realty Franchise Agreement; (ii) the collective unamortized principal balance due and owing under the Notes, plus interest, fees and costs as provided for in the Notes; and (iii) damages suffered by Corcoran as a result of the failure of ELI Realty to comply with the obligations imposed under the ELI Realty Security Agreement.

**WHEREFORE**, Corcoran demands joint and several judgment against Michael Mahon, individually, Pamela Mahon, individually, and MRM Investments LLC in the

68

amount of: (i) all sums due under the ELI Realty Franchise Agreement proven at trial, including interest, attorney's fees, and costs set forth in the ELI Realty Franchise Agreement; (ii) the collective unamortized principal balance due and owing under the Notes, plus interest, attorneys' fees and costs as provided for in the Notes; (iii) damages suffered by Corcoran as a result of the failure of the ELI Realty to comply with the obligations imposed under the ELI Realty Security Agreement; and (iv) such other and further relief that this Court deems just and proper.

## <u>SEVENTH COUNT</u>

### (Tortious Interference: Michael Mahon)

299.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

300.   The ELI Realty Security Agreement, Exclusive San Francisco Security Agreement and Exclusive SoCal Security Agreement (collectively, the "<u>Count 7 Security Agreements</u>"), are valid contracts between Corcoran and ELI Realty, Exclusive San Francisco, and Exclusive SoCal, respectively.

301.   At all relevant times, Michael Mahon was aware of the Count 7 Security Agreements.

302.   Without justification, Michael Mahon intentionally and/or maliciously interfered with the Count 7 Security Agreements by executing and delivering the Libertas Agreements and causing consummation of the transactions described therein, resulting in an incurable default by ELI Realty, Exclusive San Francisco, and Exclusive SoCal, respectively, under the Count 7 Security Agreements.

303.   Among other things, in executing the Libertas Agreements individually and on behalf of numerous entities, Michael Mahon falsely represented therein that entering into and performing under the Libertas Agreements would not result in breach or violation of, or default under, any agreement or instrument by which ELI Realty,

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD
PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

Exclusive San Francisco, or Exclusive SoCal were bound.   In fact, entry and performance under the Libertas Agreements resulted in an incurable default by ELI Realty, Exclusive San Francisco, and Exclusive SoCal, respectively, under the Count 7 Security Agreements.

304.   Michael Mahon executed the Libertas Agreements individually and on behalf of ELI Realty, Exclusive San Francisco, Exclusive SoCal, and other entities.

305.   In executing the Libertas Agreements, Michael Mahon represented that he had the full power and authority to bind Exclusive San Francisco, Exclusive SoCal, and other entities to perform their obligations under the Libertas Agreements.

306.   Upon information and belief, Michael Mahon did not have the requisite authority under the Shareholders Agreement for Exclusive Lifestyles San Francisco, Inc. to enter into the Libertas Agreements on behalf of Exclusive San Francisco.

307.   Upon information and belief, other than ELI Realty, Michael Mahon did not inform any of the shareholders of Exclusive San Francisco that Exclusive San Francisco was entering into any of the Libertas Agreements.

308.   Upon information and belief, other than ELI Realty, none of the shareholders of Exclusive San Francisco are aware of the Libertas Agreements.

309.   Upon information and belief, other than ELI Realty, none of the shareholders of Exclusive San Francisco are aware that Future Receipts of Exclusive San Francisco have been sold to Libertas.

310.   Upon information and belief, Michael Mahon did not have the requisite authority under the Operating Agreement for Exclusive Lifestyles SoCal, LLC to enter into the Libertas Agreements on behalf of Exclusive SoCal.

311.   Upon information and belief, other than ELI Realty, Michael Mahon did not inform any of the members of Exclusive SoCal that Exclusive SoCal was entering into any of the Libertas Agreements.

312.   Upon information and belief, other than ELI Realty, none of the shareholders of Exclusive SoCal are aware of the Libertas Agreements.

313.   Upon information and belief, other than ELI Realty, none of the shareholders of Exclusive SoCal are aware that Future Receipts of Exclusive SoCal have been sold to Libertas.

314.   There was, at least, a reasonable likelihood that Michael Mahon's interference with the performance of ELI Realty, Exclusive San Francisco, and Exclusive SoCal under the applicable Count 7 Security Agreements would cause loss to Corcoran.

315.   Entry and performance under the Libertas Agreements resulted in breach of the Count 7 Security Agreements by ELI Realty, Exclusive San Francisco, and Exclusive SoCal, respectively, resulting in damage to Corcoran.

**WHEREFORE**, Corcoran demands judgment against Michael Mahon, individually, for: (i) actual compensatory, consequential, incidental, special and/or exemplary/punitive damages in amounts to be proven at trial; (ii) pre-judgment interest; (iii) attorneys' fees and costs; and (iv) such other and further relief that this Court deems just and proper.

## EIGHTH COUNT

### (Enforcement of Security Interests in Accounts Receivables – ELI Realty/Libertas)

316.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

317.   The security interests granted to Corcoran in the ELI Realty Security Agreement dated January 17, 2020, were perfected by the filing of a UCC-1 Financing Statement with the Secretary of State of the State of Nevada on January 31, 2020 under number 2020069173-2.

318.   Pursuant to the ELI Realty Security Agreement, Corcoran was granted a security interest in, among other things, all (i) accounts receivable and payment intangibles of ELI Realty, then owned or thereafter acquired, and (ii) all of ELI Realty's commissions, real estate listings, listing agreements and the proceeds therefrom, then owned or thereafter acquired.

319.   Corcoran has a properly perfected, pre-existing, and senior lien on the Future Receipts of ELI Realty that were purportedly sold to Libertas per the Libertas Agreements.

320.   Corcoran's pre-existing and senior lien on the Future Receipts of ELI Realty that were purportedly sold to Libertas, is a matter of public record.

321.   Libertas knew or should have known of Corcoran's pre-existing and senior lien on the Future Receipts of ELI Realty, prior to entering into the Libertas Agreements.

322.   Corcoran did not consent to the sale of any of its collateral by ELI Realty to Libertas.

323.   Corcoran did not agree to subordinate its security interest and lien of property of ELI Realty, including Future Receipts, to Libertas.

324.   Any interest claimed by Libertas in the Future Receipts of ELI Realty, or any other property of ELI Realty that is subject to the ELI Realty Security Agreement, is subordinate to the interests that Corcoran has in such property.

**WHEREFORE**, Corcoran demands judgment against Libertas Funding LLC: (i) declaring the any interest claimed by Libertas in the Future Receipts of ELI Realty, or any other property of ELI Realty that is subject to the ELI Realty Security Agreement, is subordinate to the security interests that Corcoran has in such property under the ELI Realty Security Agreement; (ii) prohibiting Libertas from accepting or collecting any Future Receipts of ELI Realty, or any other property of ELI Realty that is subject to the

ELI Realty Security Agreement, until all obligations that are secured by the ELI Realty Security Agreement are satisfied in full; (iii) directing Libertas to pay Corcoran the amount equal to any Future Receipts of ELI Realty, or any other property of ELI Realty that is subject to the ELI Realty Security Agreement, collected or otherwise received by Libertas; (iv) for damages in amounts to be proven at trial; (v) pre-judgment interest; (vi) attorneys' fees and costs; and (vii) such other and further relief that this Court deems just and proper.

## NINTH COUNT

### (Enforcement of Security Interests in Accounts Receivables – Exclusive SoCal/Libertas)

325.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

326.   The security interests granted to Corcoran in the Exclusive SoCal Security Agreement dated September 9, 2020, were perfected by the filing of a UCC-1 Financing Statement with the Secretary of State of the State of California on September 14, 2020 under number U200019083025.

327.   Pursuant to the Exclusive SoCal Security Agreement, Corcoran was granted a security interest in, among other things, all (i) accounts receivable and payment intangibles of Exclusive SoCal, then owned or thereafter acquired, and (ii) all of Exclusive SoCal's commissions, real estate listings, listing agreements and the proceeds therefrom, then owned or thereafter acquired.

328.   Corcoran has a properly perfected, pre-existing, and senior lien on the Future Receipts of Exclusive SoCal that were purportedly sold to Libertas per the Libertas Agreements.

329.   Corcoran's pre-existing and senior lien on the Future Receipts of Exclusive SoCal that were purportedly sold to Libertas, is a matter of public record.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

330.   Libertas knew or should have known of Corcoran's pre-existing and senior lien on the Future Receipts of Exclusive SoCal, prior to entering into the Libertas Agreements.

331.   Corcoran did not consent to the sale of any of its collateral by Exclusive SoCal to Libertas.

332.   Corcoran did not agree to subordinate its security interest and lien of property of Exclusive SoCal, including Future Receipts, to Libertas.

333.   Any interest claimed by Libertas in the Future Receipts of Exclusive SoCal, or any other property of Exclusive SoCal that is subject to the Exclusive SoCal Security Agreement, is subordinate to the interests that Corcoran has in such property.

**WHEREFORE**, Corcoran demands judgment against Libertas Funding LLC: (i) declaring the any interest claimed by Libertas in the Future Receipts of Exclusive SoCal, or any other property of Exclusive SoCal that is subject to the Exclusive SoCal Security Agreement, is subordinate to the security interests that Corcoran has in such property under the Exclusive SoCal Security Agreement; (ii) prohibiting Libertas from accepting or collecting any Future Receipts of Exclusive SoCal, or any other property of Exclusive SoCal that is subject to the Exclusive SoCal Security Agreement, until all obligations that are secured by the Exclusive SoCal Security Agreement are satisfied in full; (iii) directing Libertas to pay Corcoran the amount equal to any Future Receipts of Exclusive SoCal, or any other property of Exclusive SoCal that is subject to the Exclusive SoCal Security Agreement, collected or otherwise received by Libertas; (iv) for damages in amounts to be proven at trial; (v) pre-judgment interest; (vi) attorneys' fees and costs; and (vii) such other and further relief that this Court deems just and proper.

## **TENTH COUNT**

### **(Enforcement of Security Interests in Accounts Receivables – Exclusive San Francisco/Libertas)**

334. Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

335. The security interests granted to Corcoran in the Exclusive San Francisco Security Agreement dated January 23, 2020, were perfected by the filing of a UCC-1 Financing Statement with the Secretary of State of the State of California on December 10, 2020 under number U200035937533.

336. Pursuant to the Exclusive San Francisco Security Agreement, Corcoran was granted a security interest in, among other things, all (i) accounts receivable and payment intangibles of Exclusive San Francisco, then owned or thereafter acquired, and (ii) all of Exclusive San Francisco's commissions, real estate listings, listing agreements and the proceeds therefrom, then owned or thereafter acquired.

337. Corcoran has a properly perfected, pre-existing, and senior lien on the Future Receipts of Exclusive San Francisco that were purportedly sold to Libertas per the Libertas Agreements.

338. Corcoran's pre-existing and senior lien on the Future Receipts of Exclusive San Francisco that were purportedly sold to Libertas, is a matter of public record.

339. Libertas knew or should have known of Corcoran's pre-existing and senior lien on the Future Receipts of Exclusive San Francisco, prior to entering into the Libertas Agreements.

340. Corcoran did not consent to the sale of any of its collateral by Exclusive San Francisco to Libertas.

341. Corcoran did not agree to subordinate its security interest and lien of property of Exclusive San Francisco, including Future Receipts, to Libertas.

342.   Any interest claimed by Libertas in the Future Receipts of Exclusive San Francisco, or any other property of Exclusive San Francisco that is subject to the Exclusive San Francisco Security Agreement, is subordinate to the interests that Corcoran has in such property.

**WHEREFORE**, Corcoran demands judgment against Libertas Funding LLC: (i) declaring the any interest claimed by Libertas in the Future Receipts of Exclusive San Francisco, or any other property of Exclusive San Francisco that is subject to the Exclusive San Francisco Security Agreement, is subordinate to the security interests that Corcoran has in such property under the Exclusive San Francisco Security Agreement; (ii) prohibiting Libertas from accepting or collecting any Future Receipts of Exclusive San Francisco, or any other property of Exclusive San Francisco that is subject to the Exclusive San Francisco Security Agreement, until all obligations that are secured by the Exclusive San Francisco Security Agreement are satisfied in full; (iii) directing Libertas to pay Corcoran the amount equal to any Future Receipts of Exclusive San Francisco, or any other property of Exclusive San Francisco that is subject to the Exclusive San Francisco Security Agreement, collected or otherwise received by Libertas; (iv) for damages in amounts to be proven at trial; (v) pre-judgment interest; (vi) attorneys' fees and costs; and (vii) such other and further relief that this Court deems just and proper.

## ELEVENTH COUNT

## (Fraudulent Conveyance: Libertas Agreements - Cal. Civ. Code § 3439.04(a)(2))

343.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

344.   As to Exclusive San Francisco and Exclusive SoCal, the Libertas Agreements were made, and the obligations thereunder were incurred, for less than reasonably equivalent value.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD
PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

345. Upon information and belief, Exclusive San Francisco and Exclusive SoCal received little of the proceeds from the Libertas Agreements compared to the Future Receipts of Exclusive San Francisco and Exclusive SoCal sold to Libertas.

346. Upon information and belief, Exclusive San Francisco and Exclusive SoCal received inadequate consideration for the Libertas Agreements.

347. At the time Exclusive San Francisco and Exclusive SoCal purportedly entered into the Libertas Agreements, Exclusive San Francisco and Exclusive SoCal were engaged or were about to engage in a business or a transaction for which their remaining assets were unreasonably small in relation to the business or transaction.

348. At the time Exclusive San Francisco and Exclusive SoCal purportedly entered into the Libertas Agreements, Exclusive San Francisco and Exclusive SoCal intended to incur, or believed or reasonably should have believed that Exclusive San Francisco and Exclusive SoCal would incur, debts beyond their ability to pay as they become due.

349. The Libertas Agreements, and the obligations thereunder, are voidable as to Exclusive San Francisco and Exclusive SoCal pursuant to Cal. Civ. Code § 3439.04(a)(2).

**WHEREFORE**, Corcoran demands judgment against Libertas Funding LLC (i) declaring the Libertas Agreements to be void as to Exclusive San Francisco and Exclusive SoCal; (ii) avoiding all obligations of Exclusive San Francisco and Exclusive SoCal under the Libertas Agreements; (iii) prohibiting Libertas from accepting or collecting any Future Receipts from Exclusive San Francisco or Exclusive SoCal; (iv) in the amount of the Future Receipts collected by Libertas from Exclusive San Francisco and/or Exclusive SoCal, or such other amount as may be determined at trial, plus pre-judgment interest, attorneys' fees, and costs; and (v) for such other and further relief that this Court deems just and proper.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

**TWELFTH COUNT**

**(Fraudulent Conveyance: Libertas Agreements - Cal. Civ. Code § 3439.04(a)(1))**

350.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

351.   As to Exclusive San Francisco and Exclusive SoCal, the Libertas Agreements were made with the actual intent to hinder, delay, or defraud Corcoran.

352.   The Libertas Agreements, and the obligations thereunder, are voidable as to Exclusive San Francisco and Exclusive SoCal pursuant to Cal. Civ. Code § 3439.04(a)(1).

**WHEREFORE**, Corcoran demands judgment against Libertas Funding LLC (i) declaring the Libertas Agreements to be void as to Exclusive San Francisco and Exclusive SoCal; (ii) avoiding all obligations of Exclusive San Francisco and Exclusive SoCal under the Libertas Agreements; (iii) prohibiting Libertas from accepting or collecting any Future Receipts from Exclusive San Francisco or Exclusive SoCal; (iv) in the amount of the Future Receipts collected by Libertas from Exclusive San Francisco and/or Exclusive SoCal, or such other amount as may be determined at trial, plus pre-judgment interest, attorneys' fees, and costs; and (v) for such other and further relief that this Court deems just and proper.

**THIRTEENTH COUNT**

**(Fraudulent Conveyance: Libertas Agreements - Cal. Civ. Code § 3439.05(a))**

353.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

354.   As to Exclusive San Francisco and Exclusive SoCal, the Libertas Agreements were made, and obligations thereunder were incurred, for less than reasonably equivalent value.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD
PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

355.   At the time they purportedly entered into the Libertas Agreements, Exclusive San Francisco and Exclusive SoCal were insolvent or became insolvent as a result of the agreements.

356.   The Libertas Agreements, and the obligations thereunder, are voidable as to Exclusive San Francisco and Exclusive SoCal pursuant to Cal. Civ. Code § 3439.05(a).

**WHEREFORE**, Corcoran demands judgment against Libertas Funding LLC (i) declaring the Libertas Agreements to be void as to Exclusive San Francisco and Exclusive SoCal; (ii) avoiding all obligations of Exclusive San Francisco and Exclusive SoCal under the Libertas Agreements; (iii) prohibiting Libertas from accepting or collecting any Future Receipts from Exclusive San Francisco or Exclusive SoCal; (iv) in the amount of the Future Receipts collected by Libertas from Exclusive San Francisco and/or Exclusive SoCal, or such other amount as may be determined at trial, plus pre-judgment interest, attorneys' fees, and costs; and (v) for such other and further relief that this Court deems just and proper.

## FOURTEENTH COUNT

### (Fraudulent Conveyance: Mortgage Company Transfer - Cal. Civ. Code § 3439.04(a)(2))

357.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

358.   The Mortgage Company Capital Contribution of $800,000 was transferred by ELI Realty to Aim High Capital for less than reasonably equivalent value.

359.   In fact, ELI Realty received no consideration for its funding of the Mortgage Company Capital Contribution.

360.   At the time it advanced the Mortgage Company Capital Contribution, ELI Realty was engaged or was about to engage in a business or a transaction for which the

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

remaining assets of ELI Realty were unreasonably small in relation to the business or transaction.

361.   At the time it advanced the Mortgage Company Capital Contribution, ELI Realty intended to incur, or believed or reasonably should have believed that ELI Realty would incur, debts beyond its ability to pay as they become due.

362.   ELI Realty's transfer of $800,000 to Aim High Capital is voidable pursuant to Cal. Civ. Code § 3439.04(a)(2).

**WHEREFORE**, Corcoran demands judgment against Aim High Capital Partners, LLC (i) in the amount of $800,000 or such other amount as may be determined at trial, plus pre-judgment interest, attorneys' fees, and costs; (ii) directing attachment of the membership interest of Aim High Capital in Aim High Mortgage LLC; (iii) directing attachment of all proceeds payable to Aim High Capital from or on account of its ownership interest in Aim High Mortgage LLC; (iv) prohibiting Aim High Capital from transferring or encumbering its membership interest in Aim High Mortgage LLC; and/or (v) such other and further relief that this Court deems just and proper.

## FIFTEENTH COUNT

### (Fraudulent Conveyance: Mortgage Company Transfer - Cal. Civ. Code § 3439.04(a)(1))

363.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

364.   The Mortgage Company Capital Contribution of $800,000 was transferred by ELI Realty to Aim High Capital with the actual intent to hinder, delay, or defraud Corcoran.

365.   ELI Realty's transfer of $800,000 to Aim High Capital is voidable pursuant to Cal. Civ. Code § 3439.04(a)(1).

**WHEREFORE**, Corcoran demands judgment against Aim High Capital Partners, LLC (i) in the amount of $800,000 or such other amount as may be determined at trial, plus pre-judgment interest, attorneys' fees, and costs; (ii) directing attachment of the membership interest of Aim High Capital in Aim High Mortgage LLC; (iii) directing attachment of all proceeds payable to Aim High Capital from or on account of its ownership interest in Aim High Mortgage LLC; (iv) prohibiting Aim High Capital from transferring or encumbering its membership interest in Aim High Mortgage LLC; and/or (v) such other and further relief that this Court deems just and proper.

## SIXTEENTH COUNT

### (Fraudulent Conveyance: Mortgage Company Transfer - Cal. Civ. Code § 3439.05(a))

366.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

367.   The Mortgage Company Capital Contribution of $800,000 was transferred by ELI Realty to Aim High Capital for less than reasonably equivalent value.

368.   At the time it advanced the Mortgage Company Capital Contribution, ELI Realty was insolvent or became insolvent as a result of the transfer.

369.   ELI Realty's transfer of $800,000 to Aim High Capital is voidable pursuant to Cal. Civ. Code § 3439.05(a).

**WHEREFORE**, Corcoran demands judgment against Aim High Capital Partners, LLC (i) in the amount of $800,000 or such other amount as may be determined at trial, plus pre-judgment interest, attorneys' fees, and costs; (ii) directing attachment of the membership interest of Aim High Capital in Aim High Mortgage LLC; (iii) directing attachment of all proceeds payable to Aim High Capital from or on account of its ownership interest in Aim High Mortgage LLC; (iv) prohibiting Aim High Capital from

transferring or encumbering its membership interest in Aim High Mortgage LLC; and/or (v) such other and further relief that this Court deems just and proper.

## SEVENTEENTH COUNT

### (Fraudulent Conveyance: Title Company Transfers - Cal. Civ. Code § 3439.04(a)(2))

370.  Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

371.  The Title Company Transfers were transferred by ELI Realty to Aim High Capital for less than reasonably equivalent value.

372.  Upon information and belief, ELI Realty received no consideration for its funding of the Title Company Transfers.

373.  At the time it advanced the Title Company Transfers, ELI Realty was engaged or was about to engage in a business or a transaction for which the remaining assets of ELI Realty were unreasonably small in relation to the business or transaction.

374.  At the time it advanced the Title Company Transfers, ELI Realty intended to incur, or believed or reasonably should have believed that ELI Realty would incur, debts beyond its ability to pay as they become due.

375.  The Title Company Transfers of ELI Realty to Aim High Capital are voidable pursuant to Cal. Civ. Code § 3439.04(a)(2).

**WHEREFORE**, Corcoran demands judgment against Aim High Capital Partners, LLC (i) in the amount of Title Company Transfers of ELI Realty to Aim High Capital, or such other amount as may be determined at trial, plus pre-judgment interest, attorneys' fees, and costs; (ii) directing attachment of the shares of Aim High Capital in Gradus Capital, Inc.; (iii) directing attachment of all proceeds payable to Aim High Capital from or on account of its ownership interests in Gradus Capital, Inc.; (iv) prohibiting Aim High Capital from transferring or encumbering its ownership interests in

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

Gradus Capital, Inc.; and/or (v) such other and further relief that this Court deems just and proper.

## EIGHTEENTH COUNT

**(Fraudulent Conveyance: Title Company Transfers - Cal. Civ. Code §
3439.04(a)(1))**

376.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

377.   The Title Company Transfers of ELI Realty to Aim High Capital were made by ELI Realty with the actual intent to hinder, delay, or defraud Corcoran.

378.   The Title Company Transfers of ELI Realty to Aim High Capital are voidable pursuant to Cal. Civ. Code § 3439.04(a)(1).

**WHEREFORE**, Corcoran demands judgment against Aim High Capital Partners, LLC (i) in the amount of Title Company Transfers of ELI Realty to Aim High Capital, or such other amount as may be determined at trial, plus pre-judgment interest, attorneys' fees, and costs; (ii) directing attachment of the shares of Aim High Capital in Gradus Capital, Inc.; (iii) directing attachment of all proceeds payable to Aim High Capital from or on account of its ownership interests in Gradus Capital, Inc.; (iv) prohibiting Aim High Capital from transferring or encumbering its ownership interests in Gradus Capital, Inc.; and/or (v) such other and further relief that this Court deems just and proper.

## NINETEENTH COUNT

**(Fraudulent Conveyance: Title Company Transfers - Cal. Civ. Code §
3439.05(a))**

379.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD
PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

380.   The Title Company Transfers were transferred by ELI Realty to Aim High Capital for less than reasonably equivalent value.

381.   At the time it made the Title Company Transfers, ELI Realty was insolvent or became insolvent as a result of the transfer.

382.   The Title Company Transfers of ELI Realty to Aim High Capital are voidable pursuant to Cal. Civ. Code § 3439.05(a).

**WHEREFORE**, Corcoran demands judgment against Aim High Capital Partners, LLC (i) in the amount of Title Company Transfers of ELI Realty to Aim High Capital, or such other amount as may be determined at trial, plus pre-judgment interest, attorneys' fees, and costs; (ii) directing attachment of the shares of Aim High Capital in Gradus Capital, Inc.; (iii) directing attachment of all proceeds payable to Aim High Capital from or on account of its ownership interests in Gradus Capital, Inc.; (iv) prohibiting Aim High Capital from transferring or encumbering its ownership interests in Gradus Capital, Inc.; and/or (v) such other and further relief that this Court deems just and proper.

## **TWENTIETH COUNT**

### **(Fraudulent Conveyance: Insider Transfers - Cal. Civ. Code § 3439.04(a)(2))**

383.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

384.   The Insider Transfers were transferred by ELI Realty to Matek, Pamela Mahon, and Michael Mahon (each individually, an "Insider Recipient" and collectively, the "Insider Recipients") for less than reasonably equivalent value.

385.   At the time it advanced the Insider Transfers, ELI Realty was engaged or was about to engage in a business or a transaction for which the remaining assets of ELI Realty were unreasonably small in relation to the business or transaction.

386.   At the time it advanced the Insider Transfers, ELI Realty intended to incur, or believed or reasonably should have believed that ELI Realty would incur, debts beyond its ability to pay as they become due.

387.   The Insider Transfers of ELI Realty are voidable pursuant to Cal. Civ. Code § 3439.04(a)(2).

**WHEREFORE**, Corcoran demands judgment against (i) Matek LLC in the amount of $461,057.16 or such other amount as may be determined at trial, plus pre-judgment interest, attorneys' fees, and costs, and such other and further relief that this Court deems just and proper; (ii) Pamela Mahon in the amount of $75,011.83 or such other amount as may be determined at trial, plus pre-judgment interest, attorneys' fees, and costs, and such other and further relief that this Court deems just and proper; and (ii) Michael Mahon in the amount of $564,973.93 or such other amount as may be determined at trial, plus pre-judgment interest, attorneys' fees, and costs, and such other and further relief that this Court deems just and proper.

## TWENTY-FIRST COUNT

### (Fraudulent Conveyance: Insider Transfers - Cal. Civ. Code § 3439.04(a)(1))

388.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

389.   The Insider Transfers were made by ELI Realty with the actual intent to hinder, delay, or defraud Corcoran.

390.   The Insider Transfers are voidable pursuant to Cal. Civ. Code § 3439.04(a)(1).

**WHEREFORE**, Corcoran demands judgment against (i) Matek LLC in the amount of $461,057.16 or such other amount as may be determined at trial, plus pre-judgment interest, attorneys' fees, and costs, and such other and further relief that this Court deems just and proper; (ii) Pamela Mahon in the amount of $75,011.83 or such

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD
PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

other amount as may be determined at trial, plus pre-judgment interest, attorneys' fees, and costs, and such other and further relief that this Court deems just and proper; and (ii) Michael Mahon in the amount of $564,973.93 or such other amount as may be determined at trial, plus pre-judgment interest, attorneys' fees, and costs, and such other and further relief that this Court deems just and proper.

## **TWENTY-SECOND COUNT**

### **(Fraudulent Conveyance: Insider Transfers - Cal. Civ. Code § 3439.05(a))**

391.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

392.   ELI Realty made the Insider Transfers for less than reasonably equivalent value.

393.   At the time they made the Insider Transfers, ELI Realty was insolvent or became insolvent as a result of the transfers.

394.   The Insider Transfers are voidable pursuant to Cal. Civ. Code § 3439.05(a).

**WHEREFORE**, Corcoran demands judgment against (i) Matek LLC in the amount of $461,057.16 or such other amount as may be determined at trial, plus pre-judgment interest, attorneys' fees, and costs, and such other and further relief that this Court deems just and proper; (ii) Pamela Mahon in the amount of $75,011.83 or such other amount as may be determined at trial, plus pre-judgment interest, attorneys' fees, and costs, and such other and further relief that this Court deems just and proper; and (ii) Michael Mahon in the amount of $564,973.93 or such other amount as may be determined at trial, plus pre-judgment interest, attorneys' fees, and costs, and such other and further relief that this Court deems just and proper.

## **TWENTY-THIRD COUNT**

### **(Constructive Trust)**

395.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

396.   Upon information and belief, the Franchise Fee Trustees are in possession of Franchise Fee Trust Funds.

397.   The Franchise Fee Trustees have an equitable duty to remit the Franchise Fee Trust Funds on account of amounts due to Corcoran under the JV Franchise Agreements as well as under the ELI Realty Franchise Agreement.

398.   The Franchise Fee Trustees would be unjustly enriched if they were allowed to retain the Franchise Fee Trust Funds.

399.   There was no basis for the collection, withholding or retention of the Franchise Fee Trust Funds by the Franchise Fee Trustees.

**WHEREFORE**, Corcoran demands joint and several judgment against ELI Realty, Michael Mahon, individually, and certain of Does 1-10 (i) directing the Franchise Fee Trustees to provide an accounting of the Franchise Fee Trust Funds; (ii) imposing a constructive trust in favor of Corcoran for all Franchise Fee Trust Funds received by the Franchise Fee Trustees; (iii) directing the Franchise Fee Trustees to turnover to Corcoran all Franchise Fee Trust Funds received by the Franchise Fee Trustees; (iv) for actual compensatory, consequential, incidental, special and/or exemplary/punitive damages in amounts to be proven at trial; (v) for pre-judgment interest; (vi) for attorneys' fees and costs; and (vii) for such other and further relief that this Court deems just and proper.

## TWENTY-FORTH COUNT

### (Accounting – Exclusive San Francisco)

400.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

401.   The San Francisco Franchise Agreement requires Exclusive San Francisco to report transactions to Corcoran on the date of settlement (closing) and pay certain fees to Corcoran based upon those reported transactions.

402.   The Stipulation also requires Exclusive San Francisco to report transactions to Corcoran and pay certain fees to Corcoran based upon those reported transactions as and when required under the San Francisco Franchise Agreement.

403.   Exclusive San Francisco has failed to report transactions to Corcoran as and when required under the San Francisco Franchise Agreement and Stipulation.

404.   Corcoran has demanded an accurate accounting and reporting of all transactions from Exclusive San Francisco, as required under the San Francisco Franchise Agreement and Stipulation. Exclusive San Francisco has refused to provide the required reporting, has provided inaccurate information, and/or has not provided information as required in the San Francisco Franchise Agreement and Stipulation.

405.   A complete calculation of the money damages of Corcoran cannot be ascertained without reporting and an accounting by Exclusive San Francisco of all transactions of Exclusive San Francisco, as required under the San Francisco Franchise Agreement and Stipulation.

406.   The San Francisco Franchise Agreement requires Exclusive San Francisco, at Sections 11.6 and 13, to maintain records, including a complete and current inventory of all listings and pending transactions. Despite demand, Exclusive San Francisco has not provided Corcoran with a complete and current inventory of all listings and pending transactions existing as of the Termination Date or thereafter.

88

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

407. After an Event of Default, the Exclusive San Francisco Security Agreement requires Exclusive San Francisco to assemble the collateral of Corcoran identified in the San Francisco Security Agreement (the "<u>Corcoran-San Francisco Collateral</u>") and make same available to Corcoran. Despite demand from Corcoran, Exclusive San Francisco has refused to provide Corcoran with documents identifying the Corcoran-San Francisco Collateral or the status thereof.

**WHEREFORE**, Corcoran demands judgment directing Exclusive Lifestyles San Francisco, Inc. to accurately account and report to Corcoran: (i) all unreported transactions as required under the San Francisco Franchise Agreement; (ii) a complete inventory of all listings and pending transactions of Exclusive San Francisco as of the Termination Date and thereafter; (iii) the identity, location and disposition of all of the Corcoran-Exclusive San Francisco Collateral as of and subsequent to the Termination Date; and (iv) such other and further relief that this Court deems just and proper.

<u>**TWENTY-FIFTH COUNT**</u>

**(Breach of Contract: San Francisco Franchise Agreement)**

408. Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

409. Pursuant to the terms of the San Francisco Franchise Agreement, Corcoran agreed to provide Exclusive San Francisco with a non-exclusive license to use the Corcoran Marks and Corcoran System and Exclusive San Francisco agreed to certain monetary and non-monetary obligations as more fully set forth in the San Francisco Franchise Agreement.

410. Corcoran performed all conditions, covenants, and promises required on its part in accordance with the terms and conditions of the San Francisco Franchise Agreement.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

411.   Exclusive San Francisco breached the San Francisco Franchise Agreement by, among other things, failing to pay Royalty Fees, Brand Marketing Fund contributions, and other fees as and when required under the San Francisco Franchise Agreement.

412.   As a result of Exclusive San Francisco's breach of the San Francisco Franchise Agreement, Corcoran effectively terminated the San Francisco Franchise Agreement as of the Termination Date and as set forth in the Exclusive San Francisco Termination Notice.

413.   As a result of Exclusive San Francisco's breach of the San Francisco Franchise Agreement, and Corcoran's termination of the San Francisco Franchise Agreement, Corcoran has been damaged in amount of: (i) the Exclusive San Francisco 10/31 Arrears of at least $1,703,699; (ii) Royalty Fees, New Development Services Royalty Fees, and BMF contributions that are not included in the Exclusive San Francisco 10/31 Arrears, in amounts that are proven at trial, including (a) amounts due for Royalty Fees, New Development Services Royalty Fees, BMF contributions, or referral fees on transactions pending as of the Termination Date, and (b) amounts due on account of unreported transactions by Exclusive San Francisco; (iii) liquidated damages due under the San Francisco Franchise Agreement in an amount to be proven at trial; (iv) interest, attorney's fees and costs due under the San Francisco Franchise Agreement in amounts to be proven at trial; plus (v) any additional amounts due under the San Francisco Franchise Agreement that are proven at trial based on the facts alleged herein.

**WHEREFORE**, Corcoran demands judgment against Exclusive Lifestyles San Francisco, Inc. for all sums due under the Exclusive San Francisco Franchise Agreement proven at trial, including (i) the Exclusive San Francisco 10/31 Arrears of at least $1,703,699; (ii) Royalty Fees, New Development Services Royalty Fees, and BMF contributions that are not included in the Exclusive San Francisco 10/31 Arrears, in

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

amounts that are proven at trial, including (a) amounts due for Royalty Fees, New Development Services Royalty Fees, BMF contributions, or referral fees on transactions pending as of the Termination Date, and (b) amounts due on account of unreported transactions by Exclusive San Francisco; (iii) liquidated damages due under the San Francisco Franchise Agreement in an amount to be proven at trial; (iv) interest, attorney's fees and costs due under the San Francisco Franchise Agreement in amounts to be proven at trial; plus (v) any additional amounts due under the San Francisco Franchise Agreement that are proven at trial based on the facts alleged herein; and (vi) for such other and further relief that this Court deems just and proper.

## TWENTY-SIXTH COUNT

### (Unjust Enrichment – Exclusive San Francisco)

414.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

415.   During the course of the San Francisco Franchise Agreement, Corcoran provided services to Exclusive San Francisco, which services included but were not limited to the Corcoran Marks and Corcoran System. Exclusive San Francisco knew that these services were being provided by Corcoran and accepted them and used them.

416.   Despite its obligation to do so, Exclusive San Francisco failed to pay certain Royalty Fees, Brand Marketing Fund contributions, and other fees to Corcoran due and owing under the San Francisco Franchise Agreement but has continuously continued to use the Corcoran Marks and Corcoran System.

417.   Exclusive San Francisco's failure to compensate Corcoran constitutes unjust enrichment and has damaged Corcoran in an undetermined amount.

**WHEREFORE**, Corcoran demands judgment against Exclusive Lifestyles San Francisco, Inc. (i) in an amount to be determined at trial, together with interest,

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

attorneys' fees, and costs; and (ii) such other and further relief that this Court deems just and proper.

## TWENTY-SEVENTH COUNT

### (Breach of Contract: Exclusive San Francisco Security Agreement)

418.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

419.   Corcoran performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Exclusive San Francisco Security Agreement, if any.

420.   Exclusive San Francisco breached the Exclusive San Francisco Security Agreement by, among other things, selling or otherwise disposing of Corcoran-San Francisco Collateral outside of the ordinary course of its business by entering into the Libertas Agreements and consummating the transactions described therein, including the payment of Future Receipts to Libertas.

421.   Exclusive San Francisco also breached the Exclusive San Francisco Security Agreement by, among other things, (i) failing to property maintain and care for the Corcoran-San Francisco Collateral, (ii) failing to assemble the Corcoran-San Francisco Collateral as directed by Corcoran, and (iii) utilizing, commingling, disposing of, conveying, and/or transferring Corcoran-San Francisco Collateral and the proceeds thereof without consent of Corcoran. Corcoran reserves its rights to assert additional claims related to any unlawful transfer of any of the Corcoran-San Francisco Collateral to any person or entity.

422.   As a result of Exclusive San Francisco's breaches of the Exclusive San Francisco Security Agreement, Corcoran has been damaged in an amount to be determined at trial.

**WHEREFORE**, Corcoran demands judgment against Exclusive Lifestyles San Francisco, Inc.: (i) in an amount to be determined at trial, plus interest, attorneys' fees, and costs; (ii) directing Exclusive San Francisco to assemble Corcoran-Exclusive San Francisco Collateral as designated by Corcoran and make same available to Corcoran; (iii) prohibiting Exclusive San Francisco from using Corcoran-Exclusive San Francisco Collateral, or any proceeds of the Corcoran-Exclusive San Francisco Collateral, for payment to Libertas or any other individual or entity without the written consent of Corcoran and/or from utilizing, commingling, disposing of, conveying, and/or transferring Corcoran- San Francisco Collateral or the proceeds thereof without consent of Corcoran; (iv) compelling Exclusive San Francisco to remit the proceeds of Corcoran-Exclusive San Francisco Collateral to Corcoran; and (v) for such other and further relief that this Court deems just and proper.

## TWENTY-EIGHTH COUNT

### (Breach of Contract: San Francisco Guaranty)

423.    Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

424.    Pursuant to the terms of the San Francisco Guaranty, the Guarantors agreed to, among other things, guaranty to Corcoran the prompt payment and performance under the San Francisco Franchise Agreement, the Exclusive San Francisco Security Agreement, and all other agreements between the parties.

425.    Guarantors breached their obligations under the San Francisco Guaranty by failing to make payments and perform the obligations due Corcoran under the San Francisco Franchise Agreement and/or Exclusive San Francisco Security Agreement.

426.    Corcoran has demanded payment and performance from Guarantors under the San Francisco Guaranty, and Guarantors have failed to pay or perform as they are obligated to do.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD
PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

427.   As a result of Guarantors' breach of the San Francisco Guaranty, Corcoran has been damaged in the amount of: (i) all sums due under the San Francisco Franchise Agreement proven at trial, including interest, attorney's fees, and costs set forth in the San Francisco Franchise Agreement; and (ii) any damages suffered by Corcoran as a result of the failure of Exclusive San Francisco to comply with the obligations imposed under the Exclusive San Francisco Security Agreement.

**WHEREFORE**, Corcoran demands joint and several judgment against Michael Mahon, individually, Pamela Mahon, individually, and MRM Investments LLC in the amount of: (i) all sums due under the San Francisco Franchise Agreement proven at trial, including interest, attorney's fees, and costs set forth in the San Francisco Franchise Agreement; (ii) damages suffered by Corcoran as a result of the failure of Exclusive San Francisco to comply with the obligations imposed under the Exclusive San Francisco Security Agreement; and (iii) such other and further relief that this Court deems just and proper.

## TWENTY-NINTH COUNT

### (Accounting: Exclusive SoCal)

428.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

429.   The SoCal Franchise Agreement requires Exclusive SoCal to report transactions to Corcoran on the date of settlement (closing) and pay certain fees to Corcoran based upon those reported transactions.

430.   The Stipulation also requires Exclusive SoCal to report transactions to Corcoran and pay certain fees to Corcoran based upon those reported transactions as and when required under the SoCal Franchise Agreement.

431.   Exclusive SoCal has failed to report transactions to Corcoran as and when required under the SoCal Franchise Agreement and Stipulation.

94

432.   Corcoran has demanded an accurate accounting and reporting of all transactions from Exclusive SoCal, as required under the SoCal Franchise Agreement and Stipulation. Exclusive SoCal has refused to provide the required reporting, has provided inaccurate information, and/or has not provided information as required in the SoCal Franchise Agreement and Stipulation.

433.   A complete calculation of the money damages of Corcoran cannot be ascertained without reporting and an accounting by Exclusive SoCal of all transactions of Exclusive SoCal, as required under the SoCal Franchise Agreement and Stipulation.

434.   The SoCal Franchise Agreement requires Exclusive SoCal, at Sections 11.6 and 13, to maintain records, including a complete and current inventory of all listings and pending transactions. Despite demand, Exclusive SoCal has not provided Corcoran with a complete and current inventory of all listings and pending transactions existing as of the Termination Date or thereafter.

435.   After an Event of Default, the Exclusive SoCal Security Agreement requires Exclusive SoCal to assemble the collateral of Corcoran identified in the SoCal Security Agreement (the "Corcoran-SoCal Collateral") and make same available to Corcoran.  Despite demand from Corcoran, Exclusive SoCal has refused to provide Corcoran with documents identifying the Corcoran-SoCal Collateral or the status thereof.

**WHEREFORE**, Corcoran demands judgment directing Exclusive Lifestyles SoCal, LLC to accurately account and report to Corcoran: (i) all unreported transactions as required under the SoCal Franchise Agreement; (ii) a complete inventory of all listings and pending transactions of Exclusive SoCal as of the  Termination Date and thereafter; (iii) the identity, location and disposition of all of the Corcoran-Exclusive SoCal Collateral as of and subsequent to the Termination Date; and (iv) such other and further relief that this Court deems just and proper.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

## THIRTIETH COUNT

### (Breach of Contract: SoCal Franchise Agreement)

436.    Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

437.    Pursuant to the terms of the SoCal Franchise Agreement, Corcoran agreed to provide Exclusive SoCal with a non-exclusive license to use the Corcoran Marks and Corcoran System and Exclusive SoCal agreed to certain monetary and non-monetary obligations as more fully set forth in the SoCal Franchise Agreement.

438.    Corcoran performed all conditions, covenants, and promises required on its part in accordance with the terms and conditions of the SoCal Franchise Agreement.

439.    Exclusive SoCal breached the SoCal Franchise Agreement by, among other things, failing to pay Royalty Fees, Brand Marketing Fund contributions, and other fees as and when required under the SoCal Franchise Agreement.

440.    As a result of Exclusive SoCal's breach of the SoCal Franchise Agreement, Corcoran effectively terminated the SoCal Franchise Agreement as of the Termination Date and as set forth in the Exclusive SoCal Termination Notice.

441.    As a result of Exclusive SoCal's breach of the SoCal Franchise Agreement, and Corcoran's termination of the SoCal Franchise Agreement, Corcoran has been damaged in amount of: (i) the Exclusive SoCal 10/31 Arrears of at least $1,298,066; (ii) Royalty Fees, New Development Services Royalty Fees, and BMF contributions that are not included in the Exclusive SoCal 10/31 Arrears, in amounts that are proven at trial, including (a) amounts due for Royalty Fees, New Development Services Royalty Fees, BMF contributions, or referral fees on transactions pending as of the Termination Date, and (b) amounts due on account of unreported transactions by Exclusive SoCal; (iii) liquidated damages due under the SoCal Franchise Agreement in an amount to be proven at trial; (iv) interest, attorney's fees and costs due under the SoCal Franchise

Agreement in amounts to be proven at trial; plus (v) any additional amounts due under the SoCal Franchise Agreement that are proven at trial based on the facts alleged herein.

**WHEREFORE**, Corcoran demands judgment against Exclusive Lifestyles SoCal, LLC for all sums due under the Exclusive SoCal Franchise Agreement proven at trial, including (i) the Exclusive SoCal 10/31 Arrears of at least $1,298,066; (ii) Royalty Fees, New Development Services Royalty Fees, and BMF contributions that are not included in the Exclusive SoCal 10/31 Arrears, in amounts that are proven at trial, including (a) amounts due for Royalty Fees, New Development Services Royalty Fees, BMF contributions, or referral fees on transactions pending as of the Termination Date, and (b) amounts due on account of unreported transactions by Exclusive SoCal; (iii) liquidated damages due under the SoCal Franchise Agreement in an amount to be proven at trial; (iv) interest, attorney's fees and costs due under the SoCal Franchise Agreement in amounts to be proven at trial; plus (v) any additional amounts due under the SoCal Franchise Agreement that are proven at trial based on the facts alleged herein; and (vi) for such other and further relief that this Court deems just and proper.

## THIRTY-FIRST COUNT

### (Unjust Enrichment: Exclusive SoCal)

442.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

443.   During the course of the SoCal Franchise Agreement, Corcoran provided services to Exclusive SoCal, which services included but were not limited to the Corcoran Marks and Corcoran System. Exclusive SoCal knew that these services were being provided by Corcoran and accepted them and used them.

444.   Despite its obligation to do so, Exclusive SoCal failed to pay certain Royalty Fees, Brand Marketing Fund contributions, and other fees to Corcoran due and

owing under the SoCal Franchise Agreement but has continuously continued to use the Corcoran Marks and Corcoran System.

445.   Exclusive SoCal's failure to compensate Corcoran constitutes unjust enrichment and has damaged Corcoran in an undetermined amount.

**WHEREFORE**, Corcoran demands judgment against Exclusive Lifestyles SoCal, LLC. (i) in an amount to be determined at trial, together with interest, attorneys' fees, and costs; and (ii) such other and further relief that this Court deems just and proper.

## THIRTY-SECOND COUNT

### (Breach of Contract: Exclusive SoCal Security Agreement)

446.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

447.   Corcoran performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Exclusive SoCal Security Agreement, if any.

448.   Exclusive SoCal breached the Exclusive SoCal Security Agreement by, among other things, selling or otherwise disposing of Corcoran-SoCal Collateral outside of the ordinary course of its business by entering into the Libertas Agreements and consummating the transactions described therein, including the payment of Future Receipts to Libertas.

449.   Exclusive SoCal also breached the Exclusive SoCal Security Agreement by, among other things, (i) failing to property maintain and care for the Corcoran-SoCal Collateral, (ii) failing to assemble the Corcoran-SoCal Collateral as directed by Corcoran, and (iii) utilizing, commingling, disposing of, conveying, and/or transferring Corcoran-SoCal Collateral and the proceeds thereof without consent of Corcoran.

Corcoran reserves its rights to assert additional claims related to any unlawful transfer of any of the Corcoran-SoCal Collateral to any person or entity.

450.   As a result of Exclusive SoCal's breaches of the Exclusive SoCal Security Agreement, Corcoran has been damaged in an amount to be determined at trial.

**WHEREFORE**, Corcoran demands judgment against Exclusive Lifestyles SoCal, LLC: (i) in an amount to be determined at trial, plus interest, attorneys' fees, and costs; (ii) directing Exclusive SoCal to assemble Corcoran-Exclusive SoCal Collateral as designated by Corcoran and make same available to Corcoran; (iii) prohibiting Exclusive SoCal from using Corcoran-Exclusive SoCal Collateral, or any proceeds of the Corcoran-Exclusive SoCal Collateral, for payment to Libertas any other individual or entity without the written consent of Corcoran and/or from utilizing, commingling, disposing of, conveying, and/or transferring Corcoran-SoCal Collateral or the proceeds thereof without consent of Corcoran; (iv) compelling Exclusive SoCal to remit the proceeds of Corcoran-Exclusive SoCal Collateral to Corcoran; and (v) for such other and further relief that this Court deems just and proper.

## THIRTY-THIRD COUNT

### (Breach of Contract: SoCal Guaranty)

451.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

452.   Pursuant to the terms of the SoCal Guaranty, the Guarantors agreed to, among other things, guaranty to Corcoran the prompt payment and performance under the SoCal Franchise Agreement, the Exclusive SoCal Security Agreement, and all other agreements between the parties.

453.   Guarantors breached their obligations under the SoCal Guaranty by failing to make payments and perform the obligations due Corcoran under the SoCal Franchise Agreement and/or Exclusive SoCal Security Agreement.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

454.   Corcoran has demanded payment and performance from Guarantors under the SoCal Guaranty, and Guarantors have failed to pay or perform as they are obligated to do.

455.   As a result of Guarantors' breach of the SoCal Guaranty, Corcoran has been damaged in the amount of: (i) all sums due under the SoCal Franchise Agreement proven at trial, including interest, attorney's fees, and costs set forth in the SoCal Franchise Agreement; and (ii) any damages suffered by Corcoran as a result of the failure of Exclusive SoCal to comply with the obligations imposed under the Exclusive SoCal Security Agreement.

**WHEREFORE**, Corcoran demands joint and several judgment against Michael Mahon, individually, Pamela Mahon, individually, and MRM Investments LLC in the amount of: (i) all sums due under the SoCal Franchise Agreement proven at trial, including interest, attorney's fees, and costs set forth in the SoCal Franchise Agreement; (ii) damages suffered by Corcoran as a result of the failure of Exclusive SoCal to comply with the obligations imposed under the Exclusive SoCal Security Agreement; and (iii) such other and further relief that this Court deems just and proper.

## <u>THIRTY-FORTH COUNT</u>

### (Accounting: Exclusive Ohio)

456.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

457.   The Ohio Franchise Agreement requires Exclusive Ohio to report transactions to Corcoran on the date of settlement (closing) and pay certain fees to Corcoran based upon those reported transactions.

458.   The Stipulation also requires Exclusive Ohio to report transactions to Corcoran and pay certain fees to Corcoran based upon those reported transactions as and when required under the Ohio Franchise Agreement.

459.   Exclusive Ohio has failed to report transactions to Corcoran as and when required under the Ohio Franchise Agreement and Stipulation.

460.   Corcoran has demanded an accurate accounting and reporting of all transactions from Exclusive Ohio, as required under the Ohio Franchise Agreement and Stipulation. Exclusive Ohio has refused to provide the required reporting, has provided inaccurate information, and/or has not provided information as required in the Ohio Franchise Agreement and Stipulation.

461.   A complete calculation of the money damages of Corcoran cannot be ascertained without reporting and an accounting by Exclusive Ohio of all transactions of Exclusive Ohio, as required under the Ohio Franchise Agreement and Stipulation.

462.   The Ohio Franchise Agreement requires Exclusive Ohio, at Sections 11.6 and 13, to maintain records, including a complete and current inventory of all listings and pending transactions. Despite demand, Exclusive Ohio has not provided Corcoran with a complete and current inventory of all listings and pending transactions existing as of the Termination Date or thereafter.

463.   After an Event of Default, the Exclusive Ohio Security Agreement requires Exclusive Ohio to assemble the collateral of Corcoran identified in the Ohio Security Agreement (the "Corcoran-Ohio Collateral") and make same available to Corcoran. Despite demand from Corcoran, Exclusive Ohio has refused to provide Corcoran with documents identifying the Corcoran-Ohio Collateral or the status thereof.

**WHEREFORE**, Corcoran demands judgment directing Exclusive Lifestyles Ohio, LLC to accurately account and report to Corcoran: (i) all unreported transactions as required under the Ohio Franchise Agreement; (ii) a complete inventory of all listings and pending transactions of Exclusive Ohio as of the  Termination Date and thereafter; (iii) the identity, location and disposition of all of the Corcoran-Exclusive Ohio

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

Collateral as of and subsequent to the Termination Date; and (iv) such other and further relief that this Court deems just and proper.

## **THIRTY-FIFTH COUNT**

### **(Breach of Contract: Ohio Franchise Agreement)**

464.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

465.   Pursuant to the terms of the Ohio Franchise Agreement, Corcoran agreed to provide Exclusive Ohio with a non-exclusive license to use the Corcoran Marks and Corcoran System and Exclusive Ohio agreed to certain monetary and non-monetary obligations as more fully set forth in the Ohio Franchise Agreement.

466.   Corcoran performed all conditions, covenants, and promises required on its part in accordance with the terms and conditions of the Ohio Franchise Agreement.

467.   Exclusive Ohio breached the Ohio Franchise Agreement by, among other things, failing to pay Royalty Fees, Brand Marketing Fund contributions, and other fees as and when required under the Ohio Franchise Agreement.

468.   As a result of Exclusive Ohio's breach of the Ohio Franchise Agreement, Corcoran effectively terminated the Ohio Franchise Agreement as of the Termination Date and as set forth in the Exclusive Ohio Termination Notice.

469.   As a result of Exclusive Ohio's breach of the Ohio Franchise Agreement, and Corcoran's termination of the Ohio Franchise Agreement, Corcoran has been damaged in amount of: (i) the Exclusive Ohio 10/31 Arrears of at least $383,993; (ii) Royalty Fees, New Development Services Royalty Fees, and BMF contributions that are not included in the Exclusive Ohio 10/31 Arrears, in amounts that are proven at trial, including (a) amounts due for Royalty Fees, New Development Services Royalty Fees, BMF contributions, or referral fees on transactions pending as of the Termination Date, and (b) amounts due on account of unreported transactions by Exclusive Ohio; (iii)

liquidated damages due under the Ohio Franchise Agreement in an amount to be proven at trial; (iv) interest, attorney's fees and costs due under the Ohio Franchise Agreement in amounts to be proven at trial; plus (v) any additional amounts due under the Ohio Franchise Agreement that are proven at trial based on the facts alleged herein.

**WHEREFORE**, Corcoran demands judgment against Exclusive Lifestyles Ohio, LLC for all sums due under the Exclusive Ohio Franchise Agreement proven at trial, including (i) the Exclusive Ohio 10/31 Arrears of at least $383,993; (ii) Royalty Fees, New Development Services Royalty Fees, and BMF contributions that are not included in the Exclusive Ohio 10/31 Arrears, in amounts that are proven at trial, including (a) amounts due for Royalty Fees, New Development Services Royalty Fees, BMF contributions, or referral fees on transactions pending as of the Termination Date, and (b) amounts due on account of unreported transactions by Exclusive Ohio; (iii) liquidated damages due under the Ohio Franchise Agreement in an amount to be proven at trial; (iv) interest, attorney's fees and costs due under the Ohio Franchise Agreement in amounts to be proven at trial; plus (v) any additional amounts due under the Ohio Franchise Agreement that are proven at trial based on the facts alleged herein; and (vi) for such other and further relief that this Court deems just and proper.

## THIRTY-SIXTH COUNT

### (Unjust Enrichment: Exclusive Ohio)

470.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

471.   During the course of the Ohio Franchise Agreement, Corcoran provided services to Exclusive Ohio, which services included but were not limited to the Corcoran Marks and Corcoran System. Exclusive Ohio knew that these services were being provided by Corcoran and accepted them and used them.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD
PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

472.   Despite its obligation to do so, Exclusive Ohio failed to pay certain Royalty Fees, Brand Marketing Fund contributions, and other fees to Corcoran due and owing under the Ohio Franchise Agreement but has continuously continued to use the Corcoran Marks and Corcoran System.

473.   Exclusive Ohio's failure to compensate Corcoran constitutes unjust enrichment and has damaged Corcoran in an undetermined amount.

**WHEREFORE**, Corcoran demands judgment against Exclusive Lifestyles Ohio, LLC. (i) in an amount to be determined at trial, together with interest, attorneys' fees, and costs; and (ii) such other and further relief that this Court deems just and proper.

## THIRTY-SEVENTY COUNT

### (Breach of Contract: Exclusive Ohio Security Agreement)

474.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

475.   Corcoran performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Exclusive Ohio Security Agreement, if any.

476.   Exclusive Ohio breached the Exclusive Ohio Security Agreement by, among other things, (i) failing to property maintain and care for the Corcoran-Ohio Collateral, (ii) failing to assemble the Corcoran-Ohio Collateral as directed by Corcoran, and (iii) utilizing, commingling, disposing of, conveying, and/or transferring Corcoran-Ohio Collateral and the proceeds thereof without consent of Corcoran. Corcoran reserves its rights to assert additional claims related to any unlawful transfer of any of the Corcoran-Ohio Collateral to any person or entity.

477.   As a result of Exclusive Ohio's breaches of the Exclusive Ohio Security Agreement, Corcoran has been damaged in an amount to be determined at trial.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

**WHEREFORE**, Corcoran demands judgment against Exclusive Lifestyles Ohio, LLC: (i) in an amount to be determined at trial, plus interest, attorneys' fees, and costs; (ii) directing Exclusive Ohio to assemble Corcoran-Exclusive Ohio Collateral as designated by Corcoran and make same available to Corcoran; (iii) prohibiting Exclusive Ohio from using Corcoran-Exclusive Ohio Collateral, or any proceeds of the Corcoran-Exclusive Ohio Collateral, for payment to any other individual or entity without the written consent of Corcoran and/or from utilizing, commingling, disposing of, conveying, and/or transferring Corcoran-Ohio Collateral or the proceeds thereof without consent of Corcoran; (iv) compelling Exclusive Ohio to remit the proceeds of Corcoran-Exclusive Ohio Collateral to Corcoran; and (v) for such other and further relief that this Court deems just and proper.

## THIRTY-EIGHTH COUNT

### (Breach of Contract: Ohio Guaranty)

478. Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

479. Pursuant to the terms of the Ohio Guaranty, the Guarantors agreed to, among other things, guaranty to Corcoran the prompt payment and performance under the Ohio Franchise Agreement, the Exclusive Ohio Security Agreement, and all other agreements between the parties.

480. Guarantors breached their obligations under the Ohio Guaranty by failing to make payments and perform the obligations due Corcoran under the Ohio Franchise Agreement and/or Exclusive Ohio Security Agreement.

481. Corcoran has demanded payment and performance from Guarantors under the Ohio Guaranty, and Guarantors have failed to pay or perform as they are obligated to do.

482.   As a result of Guarantors' breach of the Ohio Guaranty, Corcoran has been damaged in the amount of: (i) all sums due under the Ohio Franchise Agreement proven at trial, including interest, attorney's fees, and costs set forth in the Ohio Franchise Agreement; and (ii) any damages suffered by Corcoran as a result of the failure of Exclusive Ohio to comply with the obligations imposed under the Exclusive Ohio Security Agreement.

**WHEREFORE**, Corcoran demands joint and several judgment against Michael Mahon, individually, Pamela Mahon, individually, and MRM Investments LLC in the amount of: (i) all sums due under the Ohio Franchise Agreement proven at trial, including interest, attorney's fees, and costs set forth in the Ohio Franchise Agreement; (ii) damages suffered by Corcoran as a result of the failure of Exclusive Ohio to comply with the obligations imposed under the Exclusive Ohio Security Agreement; and (iii) such other and further relief that this Court deems just and proper.

## THIRTY-NINTH COUNT

### (Accounting: Exclusive Las Vegas)

483.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

484.   The Las Vegas Franchise Agreement requires Exclusive Las Vegas to report transactions to Corcoran on the date of settlement (closing) and pay certain fees to Corcoran based upon those reported transactions.

485.   The Stipulation also requires Exclusive Las Vegas to report transactions to Corcoran and pay certain fees to Corcoran based upon those reported transactions as and when required under the Las Vegas Franchise Agreement.

486.   Exclusive Las Vegas has failed to report transactions to Corcoran as and when required under the Las Vegas Franchise Agreement and Stipulation.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

487. Corcoran has demanded an accurate accounting and reporting of all transactions from Exclusive Las Vegas, as required under the Las Vegas Franchise Agreement and Stipulation. Exclusive Las Vegas has refused to provide the required reporting, has provided inaccurate information, and/or has not provided information as required in the Las Vegas Franchise Agreement and Stipulation.

488. A complete calculation of the money damages of Corcoran cannot be ascertained without reporting and an accounting by Exclusive Las Vegas of all transactions of Exclusive Las Vegas, as required under the Las Vegas Franchise Agreement and Stipulation.

489. The Las Vegas Franchise Agreement requires Exclusive Las Vegas, at Sections 11.6 and 13, to maintain records, including a complete and current inventory of all listings and pending transactions. Despite demand, Exclusive Las Vegas has not provided Corcoran with a complete and current inventory of all listings and pending transactions existing as of the Termination Date or thereafter.

490. After an Event of Default, the Exclusive Las Vegas Security Agreement requires Exclusive Las Vegas to assemble the collateral of Corcoran identified in the Las Vegas Security Agreement (the "Corcoran-Las Vegas Collateral") and make same available to Corcoran. Despite demand from Corcoran, Exclusive Las Vegas has refused to provide Corcoran with documents identifying the Corcoran-Las Vegas Collateral or the status thereof.

**WHEREFORE**, Corcoran demands judgment directing Exclusive Lifestyles Las Vegas, LLC to accurately account and report to Corcoran: (i) all unreported transactions as required under the Las Vegas Franchise Agreement; (ii) a complete inventory of all listings and pending transactions of Exclusive Las Vegas as of the Termination Date and thereafter; (iii) the identity, location and disposition of all of the Corcoran-

Exclusive Las Vegas Collateral as of and subsequent to the Termination Date; and (iv) such other and further relief that this Court deems just and proper.

## FORTIETH COUNT

### (Breach of Contract: Las Vegas Franchise Agreement)

491.    Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

492.    Pursuant to the terms of the Las Vegas Franchise Agreement, Corcoran agreed to provide Exclusive Las Vegas with a non-exclusive license to use the Corcoran Marks and Corcoran System and Exclusive Las Vegas agreed to certain monetary and non-monetary obligations as more fully set forth in the Las Vegas Franchise Agreement.

493.    Corcoran performed all conditions, covenants, and promises required on its part in accordance with the terms and conditions of the Las Vegas Franchise Agreement.

494.    Exclusive Las Vegas breached the Las Vegas Franchise Agreement by, among other things, failing to pay Royalty Fees, Brand Marketing Fund contributions, and other fees as and when required under the Las Vegas Franchise Agreement.

495.    As a result of Exclusive Las Vegas's breach of the Las Vegas Franchise Agreement, Corcoran effectively terminated the Las Vegas Franchise Agreement as of the Termination Date and as set forth in the Exclusive Las Vegas Termination Notice.

496.    As a result of Exclusive Las Vegas's breach of the Las Vegas Franchise Agreement, and Corcoran's termination of the Las Vegas Franchise Agreement, Corcoran has been damaged in amount of: (i) the Exclusive Las Vegas 10/31 Arrears of at least $447,270; (ii) Royalty Fees, New Development Services Royalty Fees, and BMF contributions that are not included in the Exclusive Las Vegas 10/31 Arrears, in amounts that are proven at trial, including (a) amounts due for Royalty Fees, New Development Services Royalty Fees, BMF contributions, or referral fees on transactions pending as of

the Termination Date, and (b) amounts due on account of unreported transactions by Exclusive Las Vegas; (iii) liquidated damages due under the Las Vegas Franchise Agreement in an amount to be proven at trial; (iv) interest, attorney's fees and costs due under the Las Vegas Franchise Agreement in amounts to be proven at trial; plus (v) any additional amounts due under the Las Vegas Franchise Agreement that are proven at trial based on the facts alleged herein.

**WHEREFORE**, Corcoran demands judgment against Exclusive Lifestyles Las Vegas, LLC for all sums due under the Exclusive Las Vegas Franchise Agreement proven at trial, including (i) the Exclusive Las Vegas 10/31 Arrears of at least $447,270; (ii) Royalty Fees, New Development Services Royalty Fees, and BMF contributions that are not included in the Exclusive Las Vegas 10/31 Arrears, in amounts that are proven at trial, including (a) amounts due for Royalty Fees, New Development Services Royalty Fees, BMF contributions, or referral fees on transactions pending as of the Termination Date, and (b) amounts due on account of unreported transactions by Exclusive Las Vegas; (iii) liquidated damages due under the Las Vegas Franchise Agreement in an amount to be proven at trial; (iv) interest, attorney's fees and costs due under the Las Vegas Franchise Agreement in amounts to be proven at trial; plus (v) any additional amounts due under the Las Vegas Franchise Agreement that are proven at trial based on the facts alleged herein; and (vi) for such other and further relief that this Court deems just and proper.

## <u>FORTY – FIRST COUNT</u>

### (Unjust Enrichment: Exclusive Las Vegas)

497.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

498.   During the course of the Las Vegas Franchise Agreement, Corcoran provided services to Exclusive Las Vegas, which services included but were not limited

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

to the Corcoran Marks and Corcoran System. Exclusive Las Vegas knew that these services were being provided by Corcoran and accepted them and used them.

499.   Despite its obligation to do so, Exclusive Las Vegas failed to pay certain Royalty Fees, Brand Marketing Fund contributions, and other fees to Corcoran due and owing under the Las Vegas Franchise Agreement but has continuously continued to use the Corcoran Marks and Corcoran System.

500.   Exclusive Las Vegas's failure to compensate Corcoran constitutes unjust enrichment and has damaged Corcoran in an undetermined amount.

**WHEREFORE**, Corcoran demands judgment against Exclusive Lifestyles Las Vegas, LLC. (i) in an amount to be determined at trial, together with interest, attorneys' fees, and costs; and (ii) such other and further relief that this Court deems just and proper.

## FORTY – SECOND COUNT

### (Breach of Contract: Exclusive Las Vegas Security Agreement)

501.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

502.   Corcoran performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Exclusive Las Vegas Security Agreement, if any.

503.   Exclusive Las Vegas breached the Exclusive Las Vegas Security Agreement by, among other things, (i) failing to property maintain and care for the Corcoran-Las Vegas Collateral, (ii) failing to assemble the Corcoran-Las Vegas Collateral as directed by Corcoran, and (iii) utilizing, commingling, disposing of, conveying, and/or transferring Corcoran-Las Vegas Collateral and the proceeds thereof without consent of Corcoran. Corcoran reserves its rights to assert additional claims

related to any unlawful transfer of any of the Corcoran-Las Vegas Collateral to any person or entity.

504.   As a result of Exclusive Las Vegas's breaches of the Exclusive Las Vegas Security Agreement, Corcoran has been damaged in an amount to be determined at trial.

**WHEREFORE**, Corcoran demands judgment against Exclusive Lifestyles Las Vegas, LLC: (i) in an amount to be determined at trial, plus interest, attorneys' fees, and costs; (ii) directing Exclusive Las Vegas to assemble Corcoran-Exclusive Las Vegas Collateral as designated by Corcoran and make same available to Corcoran; (iii) prohibiting Exclusive Las Vegas from using Corcoran-Exclusive Las Vegas Collateral, or any proceeds of the Corcoran-Exclusive Las Vegas Collateral, for payment to any other individual or entity without the written consent of Corcoran and/or from utilizing, commingling, disposing of, conveying, and/or transferring Corcoran-Las Vegas Collateral or the proceeds thereof without consent of Corcoran; (iv) compelling Exclusive Las Vegas to remit the proceeds of Corcoran-Exclusive Las Vegas Collateral to Corcoran; and (v) for such other and further relief that this Court deems just and proper.

## <u>FORTY – THIRD COUNT</u>

### (Breach of Contract: Las Vegas Guaranty)

505.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

506.   Pursuant to the terms of the Las Vegas Guaranty, the Guarantors agreed to, among other things, guaranty to Corcoran the prompt payment and performance under the Las Vegas Franchise Agreement, the Exclusive Las Vegas Security Agreement, and all other agreements between the parties.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

507.   Guarantors breached their obligations under the Las Vegas Guaranty by failing to make payments and perform the obligations due Corcoran under the Las Vegas Franchise Agreement and/or Exclusive Las Vegas Security Agreement.

508.   Corcoran has demanded payment and performance from Guarantors under the Las Vegas Guaranty, and Guarantors have failed to pay or perform as they are obligated to do.

509.   As a result of Guarantors' breach of the Las Vegas Guaranty, Corcoran has been damaged in the amount of: (i) all sums due under the Las Vegas Franchise Agreement proven at trial, including interest, attorney's fees, and costs set forth in the Las Vegas Franchise Agreement; and (ii) any damages suffered by Corcoran as a result of the failure of Exclusive Las Vegas to comply with the obligations imposed under the Exclusive Las Vegas Security Agreement.

**WHEREFORE**, Corcoran demands joint and several judgment against Michael Mahon, individually, Pamela Mahon, individually, and MRM Investments LLC in the amount of: (i) all sums due under the Las Vegas Franchise Agreement proven at trial, including interest, attorney's fees, and costs set forth in the Las Vegas Franchise Agreement; (ii) damages suffered by Corcoran as a result of the failure of Exclusive Las Vegas to comply with the obligations imposed under the Exclusive Las Vegas Security Agreement; and (iii) such other and further relief that this Court deems just and proper.

## FORTY – FORTH COUNT

### (Accounting: Exclusive Tahoe)

510.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

511.   The Tahoe Franchise Agreement requires Exclusive Tahoe to report transactions to Corcoran on the date of settlement (closing) and pay certain fees to Corcoran based upon those reported transactions.

512.   A complete calculation of the money damages of Corcoran cannot be ascertained without reporting and an accounting by Exclusive Tahoe of all transactions of Exclusive Tahoe, as required under the Tahoe Franchise Agreement.

513.   The Tahoe Franchise Agreement requires Exclusive Tahoe, at Sections 11.6 and 13, to maintain records, including a complete and current inventory of all listings and pending transactions.

514.   After an Event of Default, the Exclusive Tahoe Security Agreement requires Exclusive Tahoe to assemble the collateral of Corcoran identified in the Tahoe Security Agreement (the "<u>Corcoran-Tahoe Collateral</u>") and make same available to Corcoran.

**WHEREFORE**, Corcoran demands judgment directing Exclusive Lifestyles Tahoe, LLC and Exclusive Lifestyles Las Vegas, LLC to accurately account and report to Corcoran: (i) all unreported transactions as required under the Tahoe Franchise Agreement; (ii) a complete inventory of all listings and pending transactions of Exclusive Tahoe as of the  Termination Date and thereafter; (iii) the identity, location and disposition of all of the Corcoran-Exclusive Tahoe Collateral as of and subsequent to the Termination Date; and (iv) such other and further relief that this Court deems just and proper.

## <u>FORTY – FIFTH COUNT</u>

### (Breach of Contract: Tahoe Franchise Agreement)

515.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

516.   Corcoran performed all conditions, covenants, and promises required on its part in accordance with the terms and conditions of the Tahoe Franchise Agreement.

517.   As a result of Exclusive Tahoe's breach of the Tahoe Franchise Agreement, Corcoran effectively terminated the Tahoe Franchise Agreement as of the Termination Date and as set forth in the Exclusive Tahoe Termination Notice.

518.   As a result of Exclusive Tahoe's breach of the Tahoe Franchise Agreement, and Corcoran's termination of the Tahoe Franchise Agreement, Corcoran has been damaged in an undetermined amount, including: (i) any Royalty Fees, New Development Services Royalty Fees, and BMF contributions due under the Tahoe Franchise Agreement; (ii) liquidated damages due under the Tahoe Franchise Agreement in an amount to be proven at trial; (iii) interest, attorney's fees and costs due under the Tahoe Franchise Agreement in amounts to be proven at trial; plus (iv) any additional amounts due under the Tahoe Franchise Agreement that are proven at trial based on the facts alleged herein.

**WHEREFORE**, Corcoran demands judgment against Exclusive Lifestyles Tahoe, LLC and Exclusive Lifestyles Las Vegas, LLC for all sums due under the Exclusive Tahoe Franchise Agreement proven at trial, including (i) any Royalty Fees, New Development Services Royalty Fees, and BMF contributions due under the Tahoe Franchise Agreement; (ii) liquidated damages due under the Tahoe Franchise Agreement in an amount to be proven at trial; (iii) interest, attorney's fees and costs due under the Tahoe Franchise Agreement in amounts to be proven at trial; plus (iv) any additional amounts due under the Tahoe Franchise Agreement that are proven at trial based on the facts alleged herein.

## FORTY – SIXTH COUNT

### (Breach of Contract: Tahoe Guaranty)

519.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

520.   Pursuant to the terms of the Tahoe Guaranty, the Guarantors agreed to, among other things, guaranty to Corcoran the prompt payment and performance under the Tahoe Franchise Agreement and all other agreements between the parties.

521.   Guarantors breached their obligations under the Tahoe Guaranty by failing to make payments and perform the obligations due Corcoran under the Tahoe Franchise Agreement.

522.   Corcoran has demanded payment and performance from Guarantors under the Tahoe Guaranty, and Guarantors have failed to pay or perform as they are obligated to do.

523.   As a result of Guarantors' breach of the Tahoe Guaranty, Corcoran has been damaged in the amount of all sums due under the Tahoe Franchise Agreement proven at trial, including interest, attorney's fees, and costs set forth in the Tahoe Franchise Agreement.

**WHEREFORE**, Corcoran demands joint and several judgment against Michael Mahon, individually, Pamela Mahon, individually, and MRM Investments LLC in the amount of: (i) all sums due under the Tahoe Franchise Agreement proven at trial, including interest, attorney's fees, and costs set forth in the Tahoe Franchise Agreement; and (ii) such other and further relief that this Court deems just and proper.

## FORTY – SEVENTH COUNT

### (Lanham Act: Former Franchisees)

524.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint

525.   Section 32 of the Lanham Act, 15 U.S.C. §1114(1)(a), provides in pertinent part that "[a]ny person who shall, without the consent of the registrant - use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any

goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . . shall be liable in a civil action by the registrant. . . ."

526.   Upon information and belief, after the Termination Date, ELI Realty and the JV Franchisees (collectively, the "Former Franchisees") continued to market, promote, and/or operate their businesses through the unauthorized use of the Corcoran Marks, and such use has caused and is likely to continue to cause confusion or mistake among prospective or actual customers, in violation of Section 32 of the Lanham Act.

527.   Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a), provides in pertinent part:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which --
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

528.   The acts of the Former Franchisees' in marketing, promoting, and/or operating their businesses through and with the Corcoran Marks constitute:

(a)   a false designation of origin;

(b)   a false and misleading description of fact; and

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

(c)     a false and misleading representation of fact;

that caused and are likely to continue to cause confusion, or to cause mistake, or deception, as to the affiliation of the Offices and/or the Former Franchisees with Corcoran, and to cause confusion, or to cause mistake, or deception, to the effect that Corcoran sponsors or approves of the real estate brokerage services that the Former Franchisees provide at the Offices, all in violation of Section 43(a) of the Lanham Act.

529.   Section 43(c) of the Lanham Act, 15 U.S.C. §1125(c), provides in pertinent part that "[t]he owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection."

530.   The Former Franchisees each consented to such relief.  See, for example, Section 16.6 of the Ohio Franchise Agreement.

531.   The Former Franchisees' unauthorized use of the Corcoran Marks after the Termination Date has caused and will continue to cause dilution and disparagement of the distinctive quality of the Corcoran Marks, and lessened and will continue to lessen the capacity of the Corcoran Marks to identify and distinguish the goods and services of Corcoran, all in violation of Section 43(c) of the Lanham Act.

532.   The Former Franchisees' acts of infringement in violation of Sections 32, 43(a) and 43(c) of the Lanham Act are malicious, fraudulent, willful, and deliberate.

533.   The Former Franchisees' acts of infringement in violation of Sections 32, 43(a), and 43(c) of the Lanham Act have inflicted and continue to inflict irreparable harm on Corcoran.

**WHEREFORE**, Corcoran demands judgment against ELI Realty Investments, LLC; Exclusive Lifestyles SoCal, LLC; Exclusive Lifestyles San Francisco, Inc.; Exclusive Lifestyles Ohio, LLC; and Exclusive Lifestyles Las Vegas, LLC as follows:

(i)     Preliminary and permanently restraining and enjoining each of the Former Franchisees, and their parent entities, affiliates, subsidiaries, officers, directors, agents, servants, employees, and all those who act in concert or participation with them, from marketing, promoting, or operating their businesses through and with the Corcoran Marks;

(ii)     Directing that the Former Franchisees shall not, either directly or indirectly, at any time or in any manner, identify themselves or any business owned by any of them, in whole or part, as a "Corcoran"® real estate office or as otherwise associated with Corcoran, or use in any manner or for any purpose any of Corcoran's trade names, trademarks, or service marks;

(iii)     Requiring the Former Franchisees to satisfy their non-monetary post-termination obligations to Corcoran as set forth in the respective Franchise Agreements including, but not limited to, de-identification of the subject Offices from their appearance as "Corcoran ®" affiliated offices;

(iv)     Directing each Former Franchisee to provide a separate accounting of revenue and disbursements from the Termination Date through the completion of the their non-monetary post-termination obligations to Corcoran as set forth in the respective Franchise Agreements;

(v)     Entering judgment in favor of Corcoran and against each of the Former Franchisees in: (a) an amount equal to the actual damages sustained by Corcoran as a result of their termination utilization of the Corcoran Marks; (b) an amount equal to the profits earned by each Former Franchisee as a result of their post-petition utilization of the Corcoran Marks; (c) treble damages; (d) alternatively, statutory damages pursuant to 15 U.S.C. § 1117(d) in an amount , in the Court's discretion, of not less than $1,000 and not more than $100,000; (e) pre-judgment interest and post-judgment interest; and (f) all costs and attorney's fees incurred by Corcoran in this action; and

(vi)     For such other and further relief as the Court may deem just and proper.

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

## **FORTY – EIGHTH COUNT**

### **(Common Law Unfair Competition)**

534.   Corcoran repeats and makes a part hereto each and every allegation contained in the preceding paragraphs of the Complaint.

535.   Corcoran is the exclusive owner of the Corcoran Marks. Despite knowledge of Corcoran's interest in and to the Corcoran Marks, the Former Franchisees have made, and continue to make, use in commerce of the Corcoran Marks without Corcoran's permission and/or beyond the permission that Corcoran previously granted.

536.   Former Franchisees have engaged in a pattern of unfair, deceptive, and fraudulent acts to enrich themselves by misappropriating the Corcoran Marks and using them for their own benefit.

537.   Former Franchisees' unauthorized use of the Corcoran Marks after the Termination Date creates a false association between the Former Franchisees and Corcoran and tends to cause confusion, mistake, and/or deception amount consumers as to the source, quality, and nature of their goods and services.

538.   Corcoran has been damaged and will continue to be damaged by the Former Franchisees' unlawful, unfair, and/or fraudulent business practices and misleading advertising as alleged herein. Corcoran therefore is entitled to a preliminary and permanent injunction enjoining each of the Former Franchisees from using the Corcoran Marks in connection with the Former Franchisees' real estate business.

539.   As a direct and proximate result of the foregoing conduct, Corcoran has been harmed and is entitled to damages against the Former Franchisees in an amount that is presently unknown and to any and all other relief the Court deems just and proper under the law.

540.   Corcoran is informed and believes, and thereon alleges, that the Former Franchisees' conduct was willful, wanton, and in conscious disregard of Corcoran's

rights, thereby justifying an award of punitive and/or exemplary damages in an amount according to proof at trial.

**WHEREFORE**, Corcoran demands judgment against ELI Realty Investments, LLC; Exclusive Lifestyles SoCal, LLC; Exclusive Lifestyles San Francisco, Inc.; Exclusive Lifestyles Ohio, LLC; and Exclusive Lifestyles Las Vegas, LLC as follows:

(i)     Preliminary and permanently restraining and enjoining the Former Franchisees, and their parent entities, affiliates, subsidiaries, officers, directors, agents, servants, employees, and all those who act in concert or participation with them, from marketing, promoting, or operating their businesses through and with the Corcoran Marks;

(ii)     Directing that the Former Franchisees shall not, either directly or indirectly, at any time or in any manner, identify themselves or any business owned by any of them, in whole or part, as a "Corcoran"® real estate office or as otherwise associated with Corcoran, or use in any manner or for any purpose any of Corcoran's trade names, trademarks, or service marks;

(iii)     Requiring the Former Franchisees to satisfy their non-monetary post-termination obligations to Corcoran as set forth in the Franchise Agreements including, but not limited to, de-identification of the subject Offices from their appearance as "Corcoran ®" affiliated offices;

(iv)     Directing each Former Franchisee to provide a separate accounting of revenue and disbursements from the Termination Date through the completion of the their non-monetary post-termination obligations to Corcoran as set forth in the respective Franchise Agreements;

(v)     Entering judgment in favor of Corcoran and against the Former Franchisees in the amount of: (a) an amount equal to the actual damages sustained by Corcoran as a result of their post-termination utilization of the Corcoran Marks; (b) an amount equal to the profits earned by Former Franchisees as a result of their post-termination utilization of the Corcoran Marks; (c) punitive and/or exemplary damages for Former Franchisees' intentional and willful acts; (d) pre-judgment interest and post-judgment interest; and (e) all costs and attorney's fees incurred by Corcoran in this action;

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

(vi)   For such other and further relief as the Court may deem just and proper.

## FORTY-NINTH COUNT

### (Cybersquatting)

541.   Corcoran repeats and makes a part hereto each and every allegation contained in the preceding paragraphs of the Complaint.

542.   Pursuant to their respective Franchise Agreements, as of the Termination Date the Former Franchisees were each prohibited from using or establishing a domain name on the worldwide web which was similar or confusing with Corcoran's registered trade names or service marks.

543.   Even though the Franchise Agreements have been terminated, the Former Franchisees have continued to utilize a domain name *corcorangl.com* which would confuse, and has confused, internet users into believing that the Former Franchisees remain in affiliation with Corcoran; and which seeks to drive, and has driven, commercial internet traffic to the Former Franchisees' website through the use of the Corcoran® name.

544.   Section 1125(d) was added to the Lanham Act to provide a claim against anyone who registers, traffics in, or uses a domain name that is identical or confusingly similar to [the owner's] trademark with the bad faith intent to profit from the good will associated with the trademark.

545.   15 U.S.C. §1125(d)(1)(A) provides:

> A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person —

(i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and

(ii) registers, traffics in, or uses a domain name that —

(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;

(II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or

(III) is a trademark, word, or name protected by reason of section 706 of title 18 or section 220506 of title 36.

546.   In continuing to use the Corcoran Marks within their domain names after termination of the Franchise Agreements, the Former Franchisees acted with bad-faith intent to profit from the mark and has registered, trafficked in, or used a domain name that is confusingly similar to Corcoran's protected marks.

**WHEREFORE**, Corcoran demands judgment against ELI Realty Investments, LLC; Exclusive Lifestyles SoCal, LLC; Exclusive Lifestyles San Francisco, Inc.; Exclusive Lifestyles Ohio, LLC; and Exclusive Lifestyles Las Vegas, LLC as follows Former Franchisees as follows:

(i)     granting injunctive relief, on a preliminary and permanent basis, pursuant to 15 U.S.C. §1114(b), enjoining the Former Franchisees continued use of the *www.corcorangl.com* domain name, or any other name which is identical or confusingly similar to the Corcoran Marks;

(ii)     monetary damages pursuant to 15 U.S.C. §1117(a) of the Former Franchisees' profits, damages sustained by the Plaintiff, and the costs of the action;

(iii)    treble damages pursuant to 15 U.S.C. §1117(b);

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

(iv)   alternatively, statutory damages pursuant to 15 U.S.C. §1117(d) in an amount, in the Court's discretion, of not less than $1,000 and not more than $100,000;

(v)   costs of suit, including a reasonable attorney's fee; and

(vi)   for whatever further relief that this Court deems just and proper.

## FIFTIETH COUNT

### (Aiding and Abetting)

547.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

548.   Under the respective Security Agreements, the Former Franchisees owed the following fiduciary obligations to Corcoran:

*Debtor will properly maintain and care for the Collateral and will not remove the Collateral from the Offices (as defined in the Franchise Agreements);*

*Debtor has not executed and will not execute as Debtor any security agreement or financing statement covering any of the Collateral except with Secured Party, nor will Debtor pledge or encumber the Collateral, or allow any lien to be placed against the Collateral, whether voluntary or involuntary;*

*Debtor represents and warrants to Secured Party that the Collateral shall not become collateral for any other obligations previously incurred, nor collateral under any other security agreement(s) previously executed by Debtor; and*

*Debtor will not sell, contract for sale or otherwise dispose of any of the Collateral except in the ordinary course of business.*

See Security Agreements at Section 1.

549.   Under the respective Security Agreements, after an "Event of Default" the Former Franchisees were required to assemble the collateral of Corcoran and make it available to Corcoran.   Under such circumstance, the Former Franchisees had a

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

fiduciary obligation to Corcoran, to safeguard the collateral of Corcoran and to refrain from utilizing, commingling, disposing of, conveying, and/or transferring Corcoran collateral and the proceeds thereof without consent of Corcoran.

550.   As of the Termination Date, the Former Franchisees were no longer authorized to use the Corcoran Marks or participate in the Corcoran System.

551.   Michael Mahon and certain of Does 1-10 were aware (i) of each of the fiduciary obligations of the Former Franchisees to Corcoran, and (ii) that the Former Franchisees were no longer authorized to use the Corcoran Marks or participate in the Corcoran System after the Termination Date.

552.   The Former Franchisees breached the aforementioned fiduciary obligations to Corcoran by the Libertas Agreements, Franchise Fee Trust Funds, Mortgage Company Transfer, Title Company Transfer, Insider Transfers, and by utilizing, commingling, disposing of, conveying, and/or transferring Corcoran collateral and the proceeds thereof after the Termination Date, without consent of Corcoran.

553.   After the Termination Date, the Former Franchisees continued to use the Corcoran Marks or participate in the Corcoran System.

554.   Michael Mahon and certain of Does 1-10 provided substantial assistance or encouragement to the Former Franchisees': (i) breach of fiduciary obligations to Corcoran as alleged herein; (ii) continued of the Corcoran Marks and participation in the Corcoran System after the Termination Date as alleged herein; and (iii) fraudulent transfers as alleged herein – collectively, the "Tortious Activities".

555.   Upon information and belief, Michael Mahon and certain of Does 1-10 were aware of their roles in the Tortious Activities at the time they provided assistance or encouragement to the Former Franchisees.

556.   The conduct of Michael Mahon and certain of Does 1-10 was a substantial factor in causing harm to Corcoran.

557.   As a result of the aforementioned actions of Michael Mahon and certain of Does 1-10, Corcoran has been damaged in an undetermined amount.

**WHEREFORE**, Corcoran demands judgment against Michael Mahon, individually, and certain of Does 1-10, jointly and severally, for: (i) actual compensatory, consequential, incidental, special and/or exemplary/punitive damages in amounts to be proven at trial; (ii) pre-judgment interest; (iii) attorneys' fees and costs; and/or (iv) such other and further relief that this Court deems just and proper.

## FIFTY-FIRST COUNT

### (Breach of Fiduciary Duty – Michael Mahon)

558.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

559.   Michael Mahon has fiduciary duties to Corcoran, including a duty to avoid impairment of Corcoran collateral.

560.   Michael Mahon breached his fiduciary duties to Corcoran by, among other things: (i) failing to property maintain and care for collateral of Corcoran; (ii) selling or otherwise disposing of Corcoran Collateral outside of the ordinary course of business by entering into the Libertas Agreements and/or causing consummation of the transactions described therein, including the payment of Future Receipts to Libertas; (iii) causing the fraudulent conveyance of collateral of Corcoran or the proceeds thereof as described herein; (iv) withholding or "escrowing" the Franchise Fee Trust Funds as described herein; and/or (v) continued of the Corcoran Marks and participation in the Corcoran System after the Termination Date.

561.   The aforementioned actions of Michael Mahon were intentional and/or malicious as to Corcoran and/or collateral of Corcoran.

562.   As a result of Michael Mahon's breach of his fiduciary duties to Corcoran, Corcoran has been damaged in an undetermined amount.

**WHEREFORE**, Corcoran demands judgment against Michael Mahon, individually, for: (i) actual compensatory, consequential, incidental, special and/or exemplary/punitive damages in amounts to be proven at trial; (ii) pre-judgment interest; (iii) attorneys' fees and costs; and/or (iv) such other and further relief that this Court deems just and proper.

## FIFTY-SECOND COUNT

### (Aiding and Abetting)

563.   Corcoran repeats and makes a part hereof each and every allegation contained in the preceding paragraphs of the Counterclaims and Third Party Complaint.

564.   Upon information and belief, certain of Does 1-10 were aware of the fiduciary duties owed by Michael Mahon to Corcoran.

565.   Michael Mahon breached fiduciary duties to Corcoran as set forth herein.

566.   Upon information and belief, certain of Does 1-10 knowingly and substantially assisted Michael Mahon in his breach of fiduciary duties to Corcoran.

567.   Upon information and belief, certain of Does 1-10 were aware of their roles as part of an overall tortious activity at the time they provided assistance.

568.   As a result of the aforementioned activity of Michael Mahon and certain of Does 1-10, Corcoran has been damaged in an undetermined amount.

**WHEREFORE**, Corcoran demands judgment against certain of Does 1-10, jointly and severally, for: (i) actual compensatory, consequential, incidental, special and/or exemplary/punitive damages in amounts to be proven at trial; (ii) pre-judgment interest; (iii) attorneys' fees and costs; and/or (iv) such other and further relief that this Court deems just and proper.

Respectfully submitted,

Dated:        December 15, 2022        Geoffrey M. Davis (SBN 214692)
                                       K&L Gates LLP
                                       10100 Santa Monica Boulevard, 8th Floor
                                       Los Angeles, CA 90067
                                       Telephone: 310.552.5000
                                       Facsimile: 310.552.5001
                                       Email: Geoffrey.Davis@klgates.com

                                       Daniel M. Eliades, Esq. (Admitted *Pro Hac
                                       Vice*)
                                       K&L Gates LLP
                                       One Newark Center, 10th Floor
                                       Newark, NJ 07102
                                       Telephone: 973.848.4018
                                       Facsimile: 973.848.4001
                                       Email: Daniel.Eliades@klgates.com

                                       By:   /s/ *Geoffrey M. Davis*
                                             Geoffrey M. Davis
                                             *Attorneys for Corcoran Group LLC*

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD
PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 15th day of December, 2022, the foregoing document was served on all counsel of record who have consented to electronic service via the Court's CM/ECF system. Any other counsel of record who have not registered as an ECF user will be served by facsimile transmission or first class mail.

K&L GATES, LLP

By:   /s/ *Geoffrey M. Davis*
      Geoffrey M. Davis
      Attorneys for Defendant/Counterclaimant and
      Third Party Plaintiff, Corcoran Group, LLC

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF CORCORAN GROUP LLC**
8:22-CV-01195